G. MARK ALBRIGHT, ESQ.
Nevada Bar No. 1394
CHRIS ALBRIGHT, ESQ.
Nevada Bar No. 4904
**ALBRIGHT, STODDARD, WARNICK & ALBRIGHT**
801 South Rancho Drive, Suite D-4
Las Vegas, Nevada 89106
Tel:    (702) 384-7111
Fax:    (702) 384-0605
Email:  gma@albrightstoddard.com

*Attorneys for Plaintiffs*

*(additional counsel on signature page)*

### UNITED STATES DISTRICT COURT

### DISTRICT OF NEVADA

| | |
|---|---|
| Ilona Harding, an individual; Lester Thomas Harding, an individual, all on behalf of themselves and all similarly-situated individuals,<br><br>            Plaintiffs,<br><br>        vs.<br><br>Diamond Resorts Holdings, LLC; a Nevada limited liability company; Diamond Resorts International, Inc., a Delaware corporation; Diamond Resorts U.S. Collection, L.L.C., a Delaware limited liability company; Diamond Resorts International Marketing, Inc., a California corporation; Diamond Resorts International Club, Inc., a Florida corporation; Diamond Resorts Management, Inc., an Arizona corporation; Diamond Resorts U.S. Collection Members Association, a Delaware corporation; Diamond Resorts Developer & Sales Holding Company, a Delaware company; Diamond Resorts Financial Services, Inc., a California corporation; and Does 1 through 100, Inclusive,<br><br>            Defendants. | No.<br><br><br>**CLASS ACTION COMPLAINT**<br><br><br><br><br>**JURY TRIAL DEMANDED** |

Plaintiffs, Ilona Harding and Lester Thomas Harding (hereafter "Plaintiffs" or the "Hardings"), by and through their attorneys, bring this action on behalf of themselves and all persons similarly situated, against the above-referenced Defendants (collectively, "Defendants" or "DRI"), and based on personal knowledge with respect to themselves and, on information and belief derived from, among other things, investigation of counsel and review of public documents as to all other matters, complain and allege as follows:

## NATURE OF THE CASE

1.      This case arises from DRI ensnaring the Hardings and thousands of other elderly consumers in its deceptive and fraudulent scheme to sell points-based timeshare memberships ("Memberships"). DRI members, such as the Hardings, typically spent tens of thousands of dollars or more for upfront Membership fees, upsold Membership levels, and hefty annual assessments that continue in perpetuity.[1]

2.      While DRI has sold Memberships to non-elderly consumers, DRI intentionally targets individuals who were retired or approaching retirement (hereafter "elderly persons"), as they often have more time to travel and are more vulnerable to DRI's manipulative sales practices.

3.      DRI lures consumers into purchasing Memberships by advertising certain premium or high value properties at its sales presentations. Accordingly, references herein to premium or high value properties refers to properties that are consistent with the representative sample accommodations—which are the best or most desirable accommodations—offered to consumers during the sales presentations. These properties typically represent DRI's most luxurious properties or properties that are in prime locations. DRI showcases these properties knowing that consumers will be tempted to buy a Membership because they think they will be able to vacation there. The demand for these premium properties is high, and the competition to reserve their rooms is fierce. Members are disappointed when they cannot book reservations at these locations. DRI's

---

[1] For purposes of this Complaint, the term "elderly" refers to individuals age 60 and older when they purchased a DRI Membership.

premium properties are typically booked to full-capacity a year in advance. For example, DRI properties in Hawaii are particularly popular, but DRI does not maintain an adequate supply of inventory to satisfy the reasonably expected demand of its members.

4.     Beyond showcasing its premium properties, DRI employs manipulative sales practices to create a bond of trust between itself and elderly consumers. To do this, DRI uses licensed real estate agents and brokers to sell its Memberships.  DRI's licensed real estate agents then tell their customers, whether elderly or not, that they have a duty to tell customers the truth and disclose all material facts in connection with the sale of DRI Memberships.  Moreover, DRI requires purchasers in Nevada to sign a form promulgated by the State of Nevada Real Estate Division. The form is entitled "Duties Owed By A Nevada Real Estate Licensee," and it notifies consumers that DRI is under a duty to not deal with them in a manner that is deceitful, fraudulent, or dishonest. Accordingly, by design and through a uniform practice, DRI establishes a special bond of trust between itself and its elderly victims.

5.     More particularly, DRI knows that elderly consumers are buying Memberships based upon DRI's representations. DRI abuses its purported bond of trust by withholding material information from its elderly consumers and employing high-pressure sales tactics designed to force elderly persons into buying expensive Memberships that make no economic sense for someone over the age of 60. For example, DRI's sales practices are intentionally designed to exploit elderly persons by having them attend sales presentations marketed as lasting a maximum of 90 minutes, but often lasting five or six hours, or even longer. DRI is relentless with its goal to wear down elderly persons both physically and emotionally. These elderly consumers must deal with a never-ending series of DRI sales pitches despite those customers repeatedly telling DRI that they are not interested in buying a Membership. Many of these elderly consumers who attend DRI's sales presentations eventually succumb to DRI's pressure and agree to buy a Membership.  DRI's high-pressure and deceptive sales presentations are intentionally designed to accomplish one goal—to close the sale the same day the elderly person attends the sales presentation.

6.     Despite the duty to disclose, DRI has uniformly failed and continues to fail to fully

and fairly disclose all material information that a reasonable consumer, and particularly an elderly person, would consider to be important in deciding whether to purchase a DRI Membership. More particularly and by way of example, DRI uniformly fails to disclose to elderly persons (or its other consumers) that (a) there is no secondary market where purchasers can sell their DRI Memberships; (b) the absence of a secondary market is by intentional design; (c) the points DRI sells lack intrinsic value or pricing integrity; (d) the economics of DRI's perpetual vacation Membership do not make sense for an elderly consumer; (e) the "Closing Costs" DRI charges its members are baseless and unjust; (f) DRI has financial conflicts of interest because it also serves as the property managers for all resorts in its portfolio; (g) annual maintenance fee assessments will escalate each year at a rate higher than ordinary inflation and contain inappropriate and unjust charges; (h) despite its sales presentations, which tout DRI's premium resorts and member flexibility, most members will not be able to use their points to book vacations at DRI's premium resorts because DRI does not have sufficient inventory at its premium resorts to satisfy the reasonably expected demand of its members; (i) the majority of DRI's points sales come from upselling to its current member base; (j) DRI's sales agents have sales quotas that must be met and they are paid in the form of commissions. Sales agents who do not meet their quotas are at risk of losing their job; and/or (l) the high-interest loans DRI makes or credit cards DRI issues to elderly persons at the time of purchase to finance Memberships, are often unsuitable for those elderly persons. DRI loans or financing are not based on traditional assessment of the elderly person's repayment ability.

7.     The above information is uniformly withheld from consumers. Moreover, DRI controls the information consumers receive about their Memberships.  To ensure a consistent message is delivered during the sales presentations, DRI engages scripted sales practices and policies in addition to training each of its sales agents in how to (a) present its Membership product to consumers; (b) exercise undue influence, duress, coercion, annoyance and harassment to pressure consumers, including the elderly, into purchases; (c) overcome consumers' objections; and (d) execute and present the final contract to consumers for signing and consummating the sale.

8.     DRI's quality control procedures include a zero-tolerance policy for sales agents who stray from its scripts and training. DRI has also issued a press release that affirmatively represented the following:

- DRI has in place a strict set of policies and practices aimed at protecting the consumer that are in-line with industry best practices.

- DRI has a zero-tolerance policy for any member of the sales team who does not follow protocol.

A true and accurate copy of this communication was filed with the Securities and Exchange Commission as EX-99.1 to DRI's SEC 8-K, dated January 23, 2016, which is attached to this Complaint as "Exhibit 1" and incorporated herein by reference.

9.     Insiders within the timeshare industry, former DRI employees, and DRI's own public filings confirm that DRI's program largely focuses and relies upon on the "upsell" to both prospective and existing DRI members to purchase points.  DRI sales agents are trained to convince members that, despite already having paid thousands or tens of thousands of dollars, they now need to upgrade their Membership to the next tier level or join another "collection" by paying tens of thousands of dollars more.  Indeed, DRI's business model is dependent on repeatedly selling points to its existing members.  Of course, DRI is happy to take money from any unsuspecting victim, regardless of whether that person is a new or existing member.

10.     Another common tactic that DRI employs is to tell consumers who own timeshare interests in non-DRI resort properties that it is conducting an owner update event. The owner update, however, is actually a sales presentation for DRI. At these presentations, DRI typically scares the owners by telling them that, unless they convey their timeshare interests to DRI, the consumer will not be able to use their existing timeshare property.  DRI offers to accept the consumer's timeshare interests in exchange for points in a DRI Membership. The same transaction also includes the consumer paying DRI monies to become a member.

11.     As an older demographic who rely upon their social security benefits and lifetime savings, DRI's elderly customers often do not have enough cash on hand or other liquid assets to

spend on a DRI Membership. DRI solves this problem by offering its financial products to consumers so that they can quickly finalize sales transactions without undergoing the more traditional approaches to credit analysis, including for example, a debt to income ratio analysis to assess their elderly customers' ability to repay the loans. In fact, DRI has financed loans, at an average interest rate of 14.9%, that cover up to 75% of its customers' Membership costs—totaling nearly $1 billion at any given time. As further detailed below, DRI's lending arm is a significant and material source of revenue and profits for the company.

12. After financing or paying thousands or tens of thousands of dollars from savings just to purchase their DRI Memberships, DRI's members find themselves further saddled with rapidly rising annual maintenance fees, Club dues, and other assessments, all of which DRI asserts members must pay in perpetuity or default and lose their points as well as their entire "investment." If a member fails to keep current on paying these assessments, DRI has the right to foreclose on the Membership. When that happens, the member loses his points and, therefore, his entire investment.

13. Many of these DRI members have been financially ruined. Others have experienced severe stress and mental anguish as they worry about how they are going to pay their ongoing DRI bills, which are usually in the thousands and sometimes tens of thousands of dollars each year. If members default on their loans or they fail to pay their annual maintenance fee assessments or Club dues, DRI will likely recapture the members' points either through surrender or foreclosure. Once that happens, DRI resells those same points to another unsuspecting customer at full retail value.

14. DRI likes to portray itself as conveying wonderful customer service, and touts consumer satisfaction based on self-serving consumer surveys. Unfortunately, the real world paints an ugly and often tragic picture once a DRI member discovers DRI's scam. Elderly persons who purchased DRI Memberships typically find themselves living in a never-ending nightmare. The length of time between when DRI sells a Membership to an elderly consumer and when that elderly consumer discovers that he has been defrauded is usually very long and can easily take several

years. Once DRI members discover that they have been defrauded, it is generally too late to do anything about it.  DRI members cannot sell their Memberships on the secondary market because DRI has intentionally made sure that a viable, active, and/or liquid secondary or resale market will never exist. Moreover, DRI members who want to quit DRI eventually learn that not only are they unable to sell, but they also are usually unable to give away their Memberships for free.  The reason is that a DRI Membership is a liability and not an asset. As a direct consequence, there is no way for members to escape the clutches of DRI once they have joined, at least not without legal action or threat of legal action.

15.     DRI members have filed hundreds, if not thousands, of complaints about DRI online, with governmental agencies, and with DRI itself.  DRI has even received complaints from its own employees, agents, and sales people about its fraudulent and deceptive trade practices. Despite the enormous number of complaints lodged against it, DRI has done little to clean up its deceptive and fraudulent sales practices or to compensate its members for the damages they have suffered.

16.     After receiving numerous consumer complaints, the Attorney General for the State of Arizona extensively investigated DRI's sales practices.  As a result of that investigation, DRI and the Arizona Attorney General recently entered into an Assurance of Discontinuance wherein, without admitting guilt or liability, DRI agreed to stop engaging in many of the same sales practices detailed here. DRI also agreed to pay a large fine.

17.     Based on the foregoing and the other allegations in this Complaint, the Hardings bring this action on behalf of themselves and all other elderly person victims who purchased a points-based timeshare Membership from DRI during the applicable limitations period and have not received a full refund of monies or other consideration paid to Defendants.

18.     For the facts and reasons set forth more fully herein, the Hardings will show this Court that they, and the Class members, are entitled to a full refund of monies and other consideration each of them has paid to DRI or alternatively, recovery of actual damages they have suffered; recovery of reasonable and necessary attorney's fees; civil penalties; punitive damages;

treble damages and all other remedies to which they are justly entitled to either at law or in equity.

## THE PARTIES

19.    Plaintiffs ILONA HARDING and LESTER THOMAS HARDING are residents of the State of Arizona.  They are both elderly persons who purchased DRI Memberships in the Diamond Resorts U.S. Collection and the Diamond Resorts Hawaii Collection.

20.    Defendant DIAMOND RESORTS HOLDINGS, LLC ("DRH") is a Nevada Limited Liability Company with a principal place of business located at 10600 West Charleston Boulevard, Las Vegas, Nevada 89135. Its manager is registered as Diamond Resorts International, Inc., which shares the principal place of business as its business address.  DRH owns, *inter alia*, the *Vacations for Life*® trademark.

21.    Defendant DIAMOND RESORTS INTERNATIONAL, INC. ("DRII")[2] was a publicly traded corporation during the relevant period and has a principal place of business located at 10600 West Charleston Boulevard, Las Vegas, Nevada 89135. Its registered officers are identified as follows: (a) Director: David J. Berkman; (b) Director: Stephen J. Cloobeck; (c) Director: Richard M. Daley; (d) Director: Frankie Sue Del Papa; (e) Secretary: Jared Finkelstein; (f) Director: Jeffrey Jones; (g) Treasurer: Lillian Luu; (h) President: David F. Palmer; (i) Director: David F. Palmer; (j) Director: Hope S. Taitz; (k) Director: Zachary Warren; and (l) Director: Robert Wolf, all of whom share the principal place of business as their business address.  DRII is the parent corporation to each of the entities detailed below and the parent to approximately 200 or more subsidiaries during the relevant period. In certain SEC filings, DRII is identified as a

---

[2] On July 24, 2013, Diamond Resorts International, Inc. ("DRII") closed the initial public offering (the "IPO"). Prior to the consummation of the IPO, DRII was a newly-formed Delaware corporation that had not conducted any activities other than those incident to its formation and the preparation of the Registration Statement and the Final Prospectus. DRII was formed for the purpose of changing the organizational structure of Diamond Resorts Parent, LLC ("DRP") from a limited liability company to a corporation. Immediately prior to the consummation of the IPO, DRP was the parent and the sole stockholder of DRII. In connection with, and immediately prior to the completion of the IPO, each member of DRP contributed all of its equity interests in DRP to DRII in return for shares of common stock of DRII. Following this contribution, DRII redeemed the shares of common stock held by DRP and DRP was merged with and into DRII. DRII is now a holding company, and its principal asset is the direct and indirect ownership of equity interests in its subsidiaries.

holding company, and its principal asset is the direct and indirect ownership of equity interests in its subsidiaries.

22. Defendant DIAMOND RESORTS INTERNATIONAL MARKETING, INC. ("DRIM"), is a subsidiary of DRII and a California Corporation with a principal place of business located at 10600 West Charleston Boulevard, Las Vegas, Nevada 89135. Its registered officers are identified as follows: (a) Secretary: Jared Finkelstein; (b) Director: Jared Finkelstein; (c) Director: Lisa Gann; (d) Director: Keith Holmes; (e) Secretary: Howard Lanznar; (f) Treasurer: Lillian Luu; (g) Secretary: Alex Olsanksy; (h) President: David F. Palmer; (i) Secretary: Michael Shalmy, all of whom share the principal place of business as their business address. DRIM is the brokerage entity, which through its brokers and real estate agents, assists in DRI Membership sales transactions with consumers. DRIM holds itself out as the brokerage agent and licensee in the real estate transaction on behalf of Diamond Resorts U.S. Collection Development, LLC.

23. Defendant DIAMOND RESORTS INTERNATIONAL CLUB, INC. ("DRIC"), has been identified in certain Legal Documents issued by THE Club as a wholly owned subsidiary of Diamond Resorts Corporation and also has been identified as a subsidiary of DRII through certain Securities and Exchange Commission ("SEC") filings. DRIC is a Florida corporation with a principal place of business located at 10600 West Charleston Boulevard, Las Vegas, Nevada 89135. Diamond Resorts International Club, Inc. is a wholly owned subsidiary of Diamond Resorts Corporation. Diamond Resorts International Club, Inc. is the Operating Company for THE Club®. Its registered officers are identified as follows: (a) Secretary: Jared Finkelstein; (b) Director: Jared Finkelstein; (c) Director: Lisa Gann; (d) Director: Keith Holmes; (e) Secretary: Howard Lanznar; (f) Treasurer: Lillian Luu; (g) President: David Palmer; (h) Secretary: Michael Shalmy. Sarah Hulme has also been identified as the Vice President and principal contact for DRIC. DRIC is the Operating Company that controls and operates the Exchange Pool and Membership program referred to as "THE Club," which is further detailed below. Membership in THE Club is mandatory for points owners in the U.S. Collection.

24. Defendant DIAMOND RESORTS MANAGEMENT, INC. ("DRMI") is a

subsidiary of DRII and an Arizona corporation with a principal place of business located at 10600 West Charleston Boulevard, Las Vegas, Nevada 89135. Its registered officers are identified as follows: (a) Secretary:  Jared Finkelstein; (b) Director:  Jared Finkelstein; (c) Director:  Lisa Gann; (d) Director:  Keith Holmes; (e) Treasurer:  Lillian Luu; and (f) President:  David F. Palmer, all of whom share the principal place of business as their business address. Upon information and belief, there is Management Agreement in place between the U.S. Members Collection Association and DRIM, which delegates certain powers and duties to DRIM as the "plan manager" including, but not limited to, the authority to provide administrative services to the Association and the Collection and the responsibility for immediate management and operation of the Collection (other than Reservation Services) and the authority to provide financial services – including preparation and submission of annual budget to the Board of Directors for approval - for the operation of the Association and the Collection.

25.     Defendant DIAMOND RESORTS U.S. COLLECTION DEVELOPMENT, LLC (hereafter "the U.S. Collection") is a subsidiary of DRII and a Delaware Limited Liability Company with a principal place of business located at 10600 West Charleston Boulevard, Las Vegas, Nevada 89135. Its manager is registered as Diamond Resorts Developer & Sales Holding Company, which shares the principal place of business as its business address. The U.S. Collection sells Memberships to consumers in the form of points and those points are used in exchange for use of Collection properties, which are identified in more detail below. The U.S. Collection also finances those Memberships for certain consumers.

26.     Defendant DIAMOND RESORTS DEVELOPER & SALES HOLDING COMPANY ("DRDS") is a subsidiary of DRII and is organized under Delaware law. Its principal place of business is located 10600 West Charleston Boulevard, Las Vegas, Nevada 89135. Its registered officers are identified as follows: (a) Secretary: Jared Finkelstein; (b) Director: Jared Finkelstein; (c) Director: Lisa Gann; (d) Director: Keith Holmes; (e) Treasurer: Lillian Luu; (f) President: David F. Palmer, all of whom share the principal place of business as their business address. DRDS is the sole manager of Diamond Resorts U.S. Collection Development, LLC.

27.     Defendant DIAMOND RESORTS FINANCIAL SERVICES, INC. ("DRFS") is a subsidiary of DRII and a California Corporation with a principal place of business located at 10600 West Charleston Boulevard, Las Vegas, Nevada 89135. Its registered officers are identified as follows: (a) Secretary: Lisa Gann; (b) Director: Lisa Gann; (c) Treasurer: Lillian Luu; (d) Director: Lillian Luu; and (e) President: David Womer; and (f) Director: David Womer, all of whom share the principal place of business as their business address. DRFS is the servicer of the timeshare loans to which DRUS is the creditor.

28.     Defendant DIAMOND RESORTS U.S. COLLECTION MEMBERS ASSOCIATION (the "Association"), is a non-stock, non-profit corporation organized under Delaware law, whose principal place of business is in 10600 West Charleston Boulevard, Las Vegas, Nevada 89135. Plaintiffs and Class members are members of the Association. The Association has the power and authority to control properties in the U.S. Collection and the power and authority to enter into affiliation agreements with third parties such as a manager or THE Club. The Association has and continues to exercise this authority to maintain affiliations with DRI management entities and THE Club notwithstanding the inherent conflicts of interest that arise in connection with those relationships.

29.     Defendant DOES 1-30 are corporations, limited liability companies, and individuals whose true names, identities, and relationships are not yet known to Plaintiffs. Plaintiffs are informed and believe, and on that basis allege, that each of the fictitiously named Defendants is responsible in some manner for the matters and damages alleged herein, and that their actions were authorized by, ratified by, and known to the named Defendants.  Plaintiffs will amend this Complaint, or request leave to do so if required, if and when the identities of the fictitiously-named Defendants become known.

## **ALTER EGOS**

30.     At all times mentioned here, each Defendant, including the DOE Defendants, were the alter egos, agents, partners, joint venturers, joint employers, representatives, servants, employees, successors-in-interest, co-conspirators and assigns, each of the other, and at all times

relevant hereto were acting within the course and scope of their authority as such alter egos, agents, partners, joint venturers, joint employers, representatives, servants, employees, successors, coconspirators and assigns, and all acts or omissions alleged herein were duly committed with the ratification, knowledge, permission, encouragement, authorization and consent of each Defendant designated herein. Defendants are, therefore, jointly and severally liable to Plaintiffs for the damages alleged herein.

31.     DRI has over 200 subsidiaries, as reflected in current and historical SEC filings, including the other named Defendant entities.  As detailed above, each of the Defendant entities' respective agents, officers, and directors substantially overlap. By way of example, but not necessarily limitation, David Palmer served as President and/or Director (and sometimes as both) for at least six of the Defendant entities; Jared Finkelstein serves as Secretary and/or Director (and often both) for at least six of the Defendant entities; and Lilian Luu serves as Treasurer and/or Director (and sometimes both) for at least six of the Defendant entities.

32.     Each of the Defendant entities is owned and/or controlled by the other. Each entity identified above is also identified as a subsidiary on DRII's Exhibit 21.1 to its 2015 SEC 10-K filing. As recited in its 2015 SEC 10-K, DRII is holding company and its principal asset is the direct and indirect ownership of equity interests in its subsidiaries. Not inconsistent with the foregoing, DRI makes certain global representations, commingling the identity of itself with its subsidiaries. By way of example, but not necessarily limitation, a DRI SEC filing memorializes that in "North America, we hold title (via subsidiary resort developer entities) to certain intervals which have not yet been transferred to a Diamond Collection. When these intervals are transferred to a Diamond Collection, we will receive an allocation of points."

33.     According to Secretary of State registration filings in the State of Nevada, certain of DRI's respective subsidiaries are significantly undercapitalized. By way of example, but not limitation, the Secretary of State filings reflect the following total capital amount: (a) DRIM: $0; (b) DRIC: $10; (c) the U.S. Collection: $0; (d) DRDS: $30; and (e) DRFS: $100. Each of the Defendant entities commingle resources and operations at the same place of business, namely

10600 West Charleston Boulevard, Las Vegas, Nevada 89135.

34.    Each of the Defendant entities do business under the same registered trademarks, including for example DRI® and THE Club®.

35.    Each of the Defendant entities commingle assets and dominion and control over their assets. For example, in certain SEC filings, DRI identifies the Collections and respective accommodations within the Collections as DRI's resources or assets under its control, even though each Collection is purportedly a separate entity and each property within a Collection is held in trust for the benefit of the members of that trust.  As a further example of commingling, an SEC filing memorializes that in "North America, we hold title (via subsidiary resort developer entities) to certain intervals which have not yet been transferred to a Diamond Collection. When these intervals are transferred to a Diamond Collection, we will receive an allocation of points."

36.    Each of the Defendant entities commingle their operation's responsibilities and liabilities. For example, certain SEC filings appear to obligate all subsidiaries as guarantors to certain financing arrangements.

37.    Each of the Defendant entities comingle attributes of each individual Membership interest as between the Collection and THE Club for purposes of sales and marketing practices. In other words, when selling a Membership interest in the U.S. Collection, DRI sales representatives promote the benefits of THE Club, although written materials later disclaim any authority to make representations on behalf of THE Club.

## JURISDICTION AND VENUE

38.    This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because diversity of the parties exists, the proposed Class has more than 100 Class members, and the aggregate amount in controversy exceeds $5 million.

39.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(ii) because acts giving rise to the claims of the Plaintiffs herein occurred within this judicial district, and all Defendants regularly conduct business in and have engaged and continue to engage in the wrongful

1  conduct alleged herein—and, thus, are subject to personal jurisdiction—in this judicial district.

2  ## FACTUAL ALLEGATIONS COMMON TO THE CLASS

3  ### TRADITIONAL "WEEKS" OWNERSHIP MODEL

4  40.     Traditional timeshares work on a model that allots specific weeks at a resort

5  property to each consumer who purchased them.  Timeshare owners purchase the right to reserve

6  one week or multiple weeks at a specific resort in the year that he or she is entitled to usage of the

7  interest.  This type of timeshare model is typically categorized by such inseparable factors as

8  providing the traditional "weeks" owner with specific and defined Unit Type (*e.g.*, one- or two-

9  bedroom, ocean view, etc.), Ownership share (*i.e.*, the number of weeks), and Reservation and Use

10 Rights (*i.e.*, every year, every odd year, or every even year).

11 41.     When traditional "weeks" owners decide not to utilize their weeks in any given

12 year, they can often employ an exchange program administered by a third-party entity that will

13 exchange their weeks for reservations at destinations other than their home resort. By doing so,

14 owners in traditional "weeks" timeshares can the use of their timeshares in order to vacation at

15 other resorts acceptable to them.

16 42.     That use right is secured through and memorialized in respective state statutes

17 requiring a one-to-one, night-to-use requirement. For example, Nevada timeshare statutes afford

18 consumers this same protection.  *See* N.R.S. 119A.525(1)(c), 119A.307(3). The purpose of this

19 requirement is to prohibit overselling or selling the right to use more weeks or nights than are

20 available in a timeshare plan, and to assure the right and practical ability of each owner to use a

21 timeshare unit for the maximum number of nights to which the owner is entitled.

22 ### OVERVIEW OF DRI'S BUSINESS MODEL

23 43.     Rather than transacting business using a traditional timeshare model where

24 investors actually own fractional interests in real estate that they can rely upon to use and enjoy,

25 DRI has concocted a highly sophisticated and complex scheme to get elderly persons and others

26 to buy outrageously expensive Memberships in "Collections" that DRI has created. DRI claims to

27 have approximately 500,000 members in its Collections.

28

44.     This lawsuit arises in connection with the entity identified above as the U.S. Collection, which is DRI's largest Collection when measured by total number of members.

45.     The U.S. Collection is euphemistically referred to by DRI as a "right to use" vacation club. More particularly, DRI created the U.S. Collection so that a trustee can hold timeshare properties and/or interests in trust purportedly for the benefit of the U.S. Collection and its members, including the Hardings and the Class members. Depending on how much money consumers pay for their Memberships, they are then allotted a certain number of points each year and given certificates evidencing how many annual points the member has purchased.  DRI members also are insured under a title policy that covers their interest in the points they bought. Points are important because they act as the currency that members use to "try to reserve" rooms at one of the resorts within the DRI network. DRI has developed a simple matrix that advertises how many points are required to reserve a room at each of its properties. More particularly, the number of points required to rent a room depends on several factors, such as location, size of the room, time of the year, and how far in advance reservations are made. There is no limit or cap on how many members can join the DRI network. DRI does not disclose all material information necessary for an elderly person to be able to calculate his chances of being able to book or reserve a room at any of the DRI properties. As such, DRI many or most members are unable to vacation where they want and when they want once they become members and try to book rooms.

46.     DRI claims that members do not directly own real estate. Instead, the points that consumers buy give them nothing more than the right to "try to use their points" to reserve rooms at one of DRI's resort properties. Furthermore, unlike traditional timeshares where consumers have an actual right and guaranty to use properties during a calendar year, DRI members have no such assurances. Instead, rooms are doled out on a first come first serve basis. This means that there are many disgruntled DRI members because they cannot vacation where they want and when they want despite DRI's sales pitch that a points-based model offers members greater flexibility than a traditional timeshare model. The purported flexibility is small consolation to members who paid enormous amounts of money to buy DRI Memberships and then have had to pay DRI's ever

escalating annual maintenance fees in exchange for possibly nothing.

47.     The points purchased by a member in a DRI Collection are automatically entered into an exchange pool run by a DRI affiliate entity called "THE Club." THE Club does not technically sell Membership interests on behalf of each DRI Collection, but it is the reservation entity through which members ultimately reserve rooms or accommodations.

48.     Because the number of DRI accommodations is finite and DRI has a gross shortage of high value or premium properties consistent with the representative samples DRI promoted to consumers in its sales presentations, it cannot meet the reasonably expected demand of its members, despite DRI's representations that it offers its members much greater flexibility than a traditional "weeks" timeshare model. Accordingly, most members must use their points at less desirable properties often in off peak seasons when they do not want to travel.

49.     DRI members are not only in competition with each other to "try to reserve" one of the rooms or accommodations in DRI's portfolio of properties, but DRI members are also in competition with an enormous pool of other people who have the right to access the same rooms and accommodations found in the U.S. Collection. The enormous pool of other people exists because of reciprocal exchange agreements DRI has entered into with other entities. The size of these pools is in the millions and possibly tens of millions of people. By entering into reciprocal exchange agreements with Interval International and an untold number of other undisclosed third party entities, DRI has effectively devalued or diluted the points owned by members like the Hardings and Class members. In other words, the net effect of entry into the Exchange Pool is an imbalanced ratio. While the pool of competition has expanded, accommodation inventory consistent with representative samples touted by DRI remains the same or fails to increase sufficiently to meet the increasing demand. Therefore, competition is fierce and the likelihood of accessing a premium room is substantially reduced which, in turn, diminishes the perceived value of the points as represented at the point of sale. As such, the Hardings' and Class members' chances of booking a room at a desirable DRI property where they actually want to vacation at a convenient time has been and, continues to be, greatly diminished due to DRI's intentional design of its

business model. Moreover, based on the limited material information supplied by DRI to members like the Hardings, it is impossible, for elderly persons like the Hardings and the Class members to calculate with reasonable certainly what the likelihood of being able to book a room at one of the DRI properties actually is before the elderly person purchases a DRI Membership.

50. In summary, DRI members in general, and elderly persons in particular, are forced to trust DRI when they buy a Membership. On the one hand, DRI touts that its points based program offers tremendous flexibility to its members in choice of rooms and resort property locations. On the other hand, DRI fails to adequately disclose that there are substantial risks in purchasing a DRI Membership because there is no way for an elderly person to evaluate the reasonable probability of being able to book rooms or accommodations at a time when the elderly person wants to vacation at a location where the elderly person wants to vacation. Elderly persons are required to take a leap of faith that DRI has made full and fair disclosure of all material facts and information that a reasonably prudent investor needs to have to evaluate his purchase.

51. Unfortunately, as set forth throughout this Complaint, DRI has failed, and continues to fail, to make full and fair disclosure of all material facts necessary to evaluate the risks associated with purchasing Memberships in DRI before the consumer makes his purchase.  This is true even though DRI uses sales people who are licensed real estate agents.

52. In at least the state of Nevada, elderly persons, like the Hardings and Class members, must sign a form acknowledging that the real estate agent will disclose any material facts about DRI Memberships to the elderly consumers. Moreover, these licensed DRI real estate agents are required by law not to deal with consumers, including elderly persons, in a manner that is deceitful, fraudulent, or dishonest. Alternatively, DRI's own, internal broker manual and state licensing requirements mandate that DRI sales people (who are licensed real estate agents and/or brokers) disclose all material facts to consumers about DRI Memberships prior to the consummation of a sale.

53. As recognized by the National Association of Realtors, DRI's Broker also has a duty to disclose material information to non-clients, such as the Hardings and Class members:  "This duty

to disclose known material facts is based upon a real estate broker's duty to treat all persons honestly and fairly. This duty of honesty and fairness does not depend on the existence of an agency relationship." National Association of Realtors, Fiduciary Duties, Risk Management & License Law Forum, dated May 15, 2013, at 2, *available at* https://www.nar.realtor/sites/default/files/handouts-and-brochures/2014/nar-fiduciary-duty-032213.pdf.

54.     Under the DRI business model, an elderly person who joins the U.S. Collection typically pays approximately $25,000 to purchase enough points to rent a one-bedroom property for one week per year at a DRI resort consistent with the representative samples from its sales presentations. That enormous upfront payment is just the beginning of the price of admission to become a member in the U.S. Collection. Elderly DRI members must also pay annual maintenance fees, Club dues, Closing Costs, and a host of other fees and charges that are all designed to maximize profits for DRI. Moreover, these annual costs are billed to the DRI member in perpetuity. For example, maintenance fees for the right to "try to use" an average room in the U.S. Collection for a one week period, which DRI calls a "resort interest," average in excess of $1,400 per calendar year according to DRI's 2015 10-K filings with the SEC. Since there are seven (7) days in a week, this means that members in the U.S. Collection are paying more than $200 per night in maintenance fees alone just to have the right "to try to" book a room at a DRI resort, i.e. $1,400 divided by 7 days equals $200 per day. Furthermore, DRI charges an annual fee of $225-280 for Membership in THE Club. A member who buys enough points to rent a DRI room for one week is paying approximately an additional $30.00 or more per day for Club dues alone. As such, DRI is collecting at least $230 per day in maintenance fees and Club dues from that member in exchange for his right to try to use a DRI room. That calculation does not even factor in the upfront $25,000 initiation fee that the member paid DRI just to buy enough points to rent a DRI room for one week per year. To say that DRI is exploitative and a total rip-off for elderly persons in particular, is a gross understatement.

55.     The "right to try" to book a room is essentially the equivalent of buying an expensive lottery ticket.  Elderly persons are obligated to pay these maintenance fees even if they

are unable to book or use a room through no fault of their own.  It is irrelevant why an elderly member might not be able to use a resort interest. Lack of availability of accommodations, i.e., the failure of DRI to have adequate inventory to satisfy the reasonably expected demand for rooms, is not an excuse for failure to pay maintenance fees. Neither is illness, financial hardship, and other factors beyond the control of the elderly member. In fact, a lucrative portion of DRI's business model depends on its ability to recapture, through foreclosure or otherwise, a Membership when the DRI member in general, and the elderly person in particular, does not pay his or her maintenance fees. This practice allows DRI to acquire a cheap source of points or Memberships and then resell them at full retail prices to a new and unsuspecting elderly person.

56.     DRI targets an older demographic. It is common for members in the U.S. Collection to be 60 years or older, which constitutes an elderly person under the Nevada Deceptive Trade Practices Act, Nevada Revised Statutes Annotated ("N.R.S.") 598.0933.

57.     Memberships in the U.S. Collection are sold during sales presentations or "tours" as DRI calls them. DRI lures potential new members to its sales presentations in several different ways. For example, DRI contacts elderly persons who own existing timeshare deeds in other clubs with the promise of giving them an "owner update" in the timeshare club they belong to. This is just a thinly veiled disguise to persuade the elderly person to: (a) convey his deeded timeshare interest to DRI; and (b) purchase points and become a DRI member. DRI sometimes refers to these specific elderly consumers as legacy members.

58.     DRI also employs telemarketers to solicit potential new members. DRI promises these elderly persons incentives, such as free gift cards, vacations, and airline tickets if they will attend a 90-minute long sales presentation. Absent these bribes, elderly persons would not attend the tours.  Although DRI represents that these sales presentations will only last 90 minutes, the presentations inevitably drag on for many hours as DRI employs high-pressure sales tactics to capture new members. A January 22, 2016 article in the New York Times entitled "The Timeshare Hard Sell Comes Roaring Back" depicts just how aggressive DRI can be to consumers during these sales presentations. A true and accurate copy of this January 22, 2016 New York Times article is

1    attached to this Complaint as "Exhibit 2."

2      59.     DRI claims that it has a sophisticated training program for its sales personnel. DRI

3    also claims that it monitors its sales personnel and the sales presentations to assure uniformity,

4    consistency, and control over what it advertises and tells prospective and existing members.  DRI

5    even issued a press release in response to the New York Times article where DRI assured the

6    public, including the Hardings and the Class members, that it follows industry best practices in

7    selling its Memberships and protecting consumer interests. Unfortunately, the manner in which

8    DRI actually conducts its business affairs, including its sales presentations or tours, belies what

9    DRI promises in its press release.

10    **DRI's POINTS-BASED MODEL**

11    **Collection Membership**

12      60.     In contrast to the traditional "weeks" ownership model where purchasers buy

13    specific use weeks, DRI employs a points-based program that is intentionally designed to take

14    advantage of unsuspecting elderly persons like the Hardings and the Class members. Unlike a

15    traditional weeks-based timeshare model, DRI's points-based timeshare plan obligates consumers

16    in general, and elderly persons in particular, to a series of confusing Memberships and unbridled

17    pools of competition.

18      61.     In DRI's timeshare plan, properties and/or use interests in different properties are

19    acquired and then transferred into trust(s). Those trusts then allocate points to the respective

20    Membership Collections for sale to purchasers. Points are intended to represent the currency that

21    DRI members "try to use" to book accommodations. However, the dollar value of these points is

22    not correlated to any traditional market value. The amount of points attributed to a particular

23    accommodation or use interest within a trust is entirely arbitrary and can be manipulated at will by

24    DRI to the detriment of the members. Similarly, the valuation of those points for purposes of sale

25    to consumers is entirely arbitrary and set by DRI alone without input from its members.

26      62.     When a consumer purchases points for the purpose of buying or upgrading a

27    Membership, those points purportedly represent that consumer's interest in a specific Collection

28

Membership (also known as a vacation ownership interest), which is tied, on its face, to a set of properties described and identified in DRI's Nevada Public Offering Statement. DRI has a series of Collections available for Membership, including

    a.   U.S. Collection, which includes interests in resorts located in Arizona, California, Colorado, Florida, Indiana, Missouri, Nevada, New Mexico, South Carolina, Tennessee, Virginia, and St. Maarten;

    b.   Hawaii Collection, which includes interests in resorts located in Arizona, California, Hawaii, Nevada, and Utah; Premiere Vacation Collection;

    c.   California Collection, which includes interests in resorts located in Arizona, California, and Nevada;

    d.   Premiere Vacation Collection, which includes interests in resorts located in Arizona, Colorado, Indiana, Nevada, and Baja California Sur, Mexico;

    e.   Monarch Grand Vacations Collection, which includes interests in resorts located in California, Nevada, Utah, and the Cabo Azul Resort located in San Jose Del Cabo, Mexico;

    f.   European Collection, which includes interests in resorts located in Austria, England, France, Italy, Norway, Portugal, Scotland, and Spain;

    g.   Latin America Collection, which includes interests in resorts located in the Cabo Azul Resort located in San Jose Del Cabo, Mexico;

    h.   Mediterranean Collection, which includes interests in resorts located in the Greek Islands of Crete and Rhodes; and

    i.   Club Intrawest, which includes interests in resorts located in Canada, Mexico, as well as Florida and California, which was added to the resort network in connection with Intrawest Acquisition in January 2016.

63.    In general, Membership in a Collection is perpetual (unless a consumer purchased term points), meaning that the Membership continues without limitation unless a Collection itself is terminated or dissolved.

64.    A Membership in a Collection consists of the following: (a) a Membership in the Members Association for the respective Diamond Resorts Collection (*e.g.*, the U.S. Collection); and (b) an annual allocation of points for use in that Collection.  The annual allotment of points to each member depends upon the number of points the member purchased.

65.     Purportedly, these points entitle a DRI member the right to use a Collection's accommodations. In reality, a member gets nothing more than the right "to try to use" a Collection's accommodations because the points purchased within a Collection Membership are also automatically assigned or made available to an Exchange Program, subject to limited exception. That Exchange Program is structured to allow for a limitless pool of individuals with other points, not all of which represent accommodation-use interests. And, in its Nevada Public Offering Statement, DRI makes participation in THE Club mandatory for a points-owner.

### THE Club® Membership

66.     THE Club® is the trade name used to identify the Exchange Program DRI owns and operates. THE Club and Club offerings are collectively referred to as "the Clubs." Significantly, use interests contributed to the Clubs are not required to be exclusively accommodation interests.

67.     Membership in THE Club® is automatic[3] and, it is tiered based on the number of points owned as follows: (a) Standard – Up to 14,999 points; (b) Silver – 15,000 - 29,999 points; (c) Gold – 30,000-49,999 points; and (d) Platinum – 50,000 and more points.

68.     Because Membership in THE Club® is mandatory and automatic for points owners, the net effect of purchasing points in a DRI Collection is an assignment of those points or use rights into DRI's exchange pool.

69.     However, a Collection Membership is not even limited to a DRI Exchange Pool. Instead, each member is automatically obligated to an affiliation with Interval International ("II") and any other third-party entity or affiliate with whom DRI has contracted. Although DRI obligates members to certain financial commitments or other obligations related to these third-party entities, DRI fails to disclose at the point of sale the impact, relationship, or related obligations arising from the relationship between DRI and these third-party entities.

70.     Consequently, when an elderly person purchases DRI points, he or she is automatically, and unbeknownst to that elderly person, obligated to a series of distinct

---

[3] Purchasers in Florida and Mexico must affirmatively elect to join THE Club®.

memberships and conditions, some of which are disclosed and some of which are not disclosed to the DRI member. For example, an elderly person is neither provided with copies of DRI's agreements with affiliate entities in the Exchange Program nor does DRI disclose any material information to the elderly person about the affiliate entities or how the reciprocal exchange agreements might impact the rights of the elderly person. This failure or omission by DRI makes it impossible for a DRI member to evaluate his or her chances of using a DRI accommodation or the other risks associated with purchasing a DRI Membership.

71.    The Exchange Pool is not limited to DRI accommodation interests. Instead, the Exchange Pool consists of an aggregation or amalgam of accommodation use interests **and** any "Other Redemption Opportunity" that DRI has contracted for to place into the Exchange Pool. DRI has defined "Other Redemption Opportunity" as anything made available for Members to obtain in exchange for their points, other than Accommodations. These may include, but are not necessarily limited to, travel, leisure, or vacation related products or benefits. In other words, any "Other Redemption Opportunity" means anything that is **not** an accommodation. For example, consumers who are unable to book rooms at a DRI accommodation are desperate not to waste their points by having them go unused while still paying exorbitant maintenance fees. Under certain strict rules, members can bank or save some or all of their points for a maximum of one year only. Otherwise, unused points are lost forever. To salvage any worth out of their points, a consumer might, for example, redeem points at a value of 7 to 10 cents on the dollar for car rentals, hotels and airline tickets. The exchange rate—meaning the exchange rate offered by DRI as between dollars and points—depends on the level of Membership such as bronze, silver, gold or platinum. Unfortunately for the consumer, DRI typically sells points for about $4-8 each. At that exchange rate, it could take a Silver member 50 years to recoup an original $4 per point investment if the redemption value of each point is 8 cents in today's money.

72.    This scheme DRI has developed is particularly pernicious to elderly persons.  Using the Hardings as an example, the reasonable number of years that a married couple aged 74 and 76 can use a DRI Membership is decades shorter than a married couple in their mid-30s. To

demonstrate how outrageous DRI's scheme happens to be, consider the case of a 75-year-old silver level member who paid $4 per point and is forced to use his or her DRI points on these "Other Redemption Opportunities," and not DRI rooms or accommodations. That elderly member may have to live to be about 125 years old just to recoup his original upfront investment. In other words, it may take 50 years to recoup the $4 per point cost of Membership using a redemption rate of 8 cents per year per point. Of course, that is an actuarial impossibility. DRI knew this when it sold Memberships to the Hardings and the Class members. Moreover, the Hardings and the Class members will still be obligated to pay annual maintenance fees, Club dues, and special assessments in perpetuity (or at least for the rest of their lives) even if they are unable to book accommodations at DRI properties through no fault of their own.

73.     DRI's failure to have adequate high value or premium inventory to satisfy the reasonably expected demand of its members to use is nothing more than a sinister form of elder abuse. More particularly, DRI knowingly played upon the emotions and dreams of its elderly members by promising "Vacations for a Lifetime" and promoting DRI to be the company of "YES" while it was conducting its sales presentation and in distributing similar advertising literature that is available to the public. These representations made by DRI had the desired effect of luring elderly persons to become DRI members. The sad reality is that by the time elderly members in DRI discover that they may never be able to book a room at one of DRI's high value or premium properties, it is too late to get out of DRI. They have been badly damaged.

### The Negative Impact of DRI's Model

74.     The Hardings and the Class members should be able to reserve rooms at locations where they want to vacation when they want to vacation. After all, they have paid enormous sums of money just to join DRI. Moreover, they are obligated to pay ever increasing maintenance fees, Club dues, and special assessments for the rest of their lives. Alternatively, DRI should have warned the Hardings and the Class members that there was a significant risk that they would not be able to vacation where they want when they want, rather than making some vague, general statement such as the longer a member waits to make a reservation the less likely it is that he or

she will be able to book a room at a resort where the member wants to travel. That information, standing alone, conveys little valuable information to the elderly person.

75.     As it is structured, the Exchange Pool consists of both accommodation interests and Other Redemption Opportunities. As a result, Collection members are competing with: (a) members in their specific DRI Collection; (b) members in any and all DRI Collections; (c) members in Interval International; and (d) any other affiliate entity with whom DRIC has contracted to enter the Exchange Pool, regardless of whether that entity has contributed "Other Redemption Opportunities" rather than usage rights in an actual accommodation.

76.     Assignment into the Exchange Pool results in the following consequences: (a) inadequate accommodation inventory to satisfy demand of points owners; (b) significant and increased difficulty in making reservations; (c) dilution of points values as a consequence of the structure of the Exchange Pool; (d) exorbitant fees to absorb DRI's costs for maintaining its Exchange Pool; (e) absence of fiscal stability secured by the traditional timeshare model; and (f) absence of total transparency into what the consumer is buying. More particularly, the very structure of DRI's business model makes it impossible for a consumer to evaluate or calculate his chances of being able to book a room at an accommodation he wants to use at a time that is convenient for him and to understand the other risks associated with buying a DRI Membership.

77.     Further, the points-based model undermines the very motivation for purchasing a Membership altogether, namely avoiding the volatility in rates for vacation accommodations, to pay in current dollars for future vacations free of inflation, and to avert the purported difficulty and uncertainty of securing accommodations at traditional hotel rooms and lodging facilities. Not only has the value of the timeshare Membership interest been substantially diminished by the limitless nature of the Exchange Pool, but also by the arbitrary valuation of points and the lack of pricing integrity.

78.     As will be detailed below, none of this material information is fully and fairly disclosed to consumers during the sales process. The result is that elderly persons are left clueless about what they are buying, including the risks associated with purchasing a DRI Membership.

**DRI's Management Fees**

79.     Beyond the revenue generated directly from sales of its Memberships and companion financial products, DRI generates revenue by charging exorbitant management fees in general, and property management fees in particular.  As a consequence of their Membership, consumers pay a base assessment fee in addition to a per point fee for their Collection Membership; a base assessment fee in addition to a per point fee for THE Club® Membership; and any other special fees assessed. As recited above, THE Club® Membership fees include fees for membership in Interval International and, further, encompass obligations or costs related to any Other Redemption Opportunity included within the Exchange Program–Other Redemption Opportunities consist of points in the Exchange Program that are not tied to accommodation interests.

80.     Among the fees assessed to consumers are costs related to DRI management contracts. As described above, DRI's management contracts operate on a cost-plus basis. Management contracts renew automatically, and require management fees generally ranging from 10% to 15% of the costs of operating the applicable resort or Diamond Collection (with a weighted average of 13.9% based upon the total management fee revenue for the year ended December 31, 2015). DRI's revenue from management contracts increase to the extent that (a) operating costs (including reserves for capital projects such as renovations and upgrades) at managed resorts and the Diamond Collections rise and, consequently, management fees increase proportionately under the cost-plus management contracts; (b) DRI adds services under their management contracts; or (c) DRI acquires or enters into contracts to manage resorts not previously managed by them.

81.     In other words, each time DRI decides to add a service to its program or undertakes a new capital project, consumer members' fees increase substantially to cover the 10-15% commission owing to DRI for the management services contemplated under the management contracts. The commission based incentives for DRI included in the terms of these management contracts give rise to an inherent conflict of interest, which is not disclosed to consumers at the point of sale. Moreover, DRI maintains substantial control over these management arrangements

because DRI maintains a presence on the board of directors for each Collection association and holds points in each respective Collection. The voting power for the class of units held by DRI is three (3) votes per unit whereas the voting power for consumer members is one (1) vote per unit. This significant disparity in voting power results in substantial dominion and control by DRI over the respective member associations.

82.    Beyond the substantial dominion and control that DRI exercises over respective Collection Associations, fees are also assessed against members by DRI for costs related to THE Club notwithstanding the fact that members have no voting rights or other means of impacting business decisions in THE Club whatsoever. In effect, each respective Collection Membership Association is a receptacle for costs and debts associated with maintenance of THE Club, and individual members are required to absorb those costs and debts in addition to costs for its own Collection. DRI did not disclose this information to the Hardings or the Class members before they bought their DRI Memberships. Had the information been disclosed to the Hardings and the Class members, they would not have bought their Memberships or, at a minimum, would not have paid a price premium.

**DRI Financing**

83.    As part of its marketing and sales efforts, DRI "offers" financing for the purchase price of the points it sells to consumers (*e.g.*, to purchase a Membership or upgrade to a new level). This is an additional and lucrative source of DRI revenue from consumer sales in general, and elderly persons in particular.

84.    DRI is equipped with 24/7 customer service centers located across the U.S. with team members able to handle loans as well as take reservations. These customer service representatives are trained, and that training includes a five-week program that educates team members on the Diamond brand and includes E-Learning and cross training. The centers are fully integrated into DRI's phone systems and have access to customer account information allowing members to access certain automated services 24/7.

85.    Once a consumer agrees to buy a Membership at the sales center, a sales worksheet

is filled out and sent via fax/email to a centralized underwriting location in Las Vegas, Nevada. The information is put through the credit decision model and underwriting staff receives and reviews the applicant's credit report.   Reportedly, the entire approval process only takes approximately nine minutes to complete.

86.   Membership financing is a substantial segment of DRI's business. From January 1, 2011 through December 31, 2015, DRI financed 74.5% of the total amount of its Membership sales.

87.   Affordability measures such as debt to income criteria are not part of the underwriting matrix. Although DRI Membership financing is ultimately unsustainable for many consumers—which DRI would know if it employed simple income to debt ratio in its credit analysis—DRI continues to offer financing at credit card interest rates.

88.   Additionally, as set forth throughout the Complaint, DRI makes loans that are inappropriate, abusive, and/or unsuitable to elderly persons. DRI fails to disclose that the interest it charges on its loans is not tax deductible, even though DRI issues 1098 forms to the borrowers showing how much the member paid in mortgage interest on the loan. This causes confusion in the minds of the elderly person who finance their Memberships through DRI.

89.    Without these financial products or receivables, DRI would have no source of low-cost inventory. Additionally, the financial arm of DRI is a significant profit center due to the high interest rates it charges on loans and its members' inability to refinance their loans through traditional lenders.  DRI failed to disclose the above material information to the Hardings or the Class members.

**DRI's Marketing and Sales Practices**

90.   Beyond the material and adverse impact inherent to DRI's points-based model, DRI's high-pressure sales tactics coupled with its pattern and practice of non-disclosure of material information constitutes unlawful and deceptive trade practices and fraud. DRI markets and promotes its points-based product predominantly through its sales presentations at its respective sales centers. There are approximately sixty-one (61) DRI sales centers at DRI controlled or

managed properties where consumers stay. DRI targets elderly persons who are inherently susceptible to financial and other abusive sales tactics.

91.     DRI's sales methods and tactics arise from uniform practices and policies in the course of the sales process. According to its 2015 SEC 10-K filings, DRI's sales force is highly trained in consultative sales approaches; DRI manages its sales representatives' consistency of presentation and professionalism using a variety of sales tools and technology; and sales representatives are principally compensated on a variable basis determined by performance, i.e., they are largely compensated by commissions. DRI touts its sales process as effective in increasing the likelihood that consumers will buy its Membership interests and increase the average transaction size.

92.     DRI employs brokers to sell its Membership interests in the form of points, and each broker is subject to a uniform brokerage policy, which governs the practice and disclosure of material information. Pursuant to DRI's own brokerage policy, "a 'material fact' is important information relevant to the transaction that could make a difference in the terms and conditions of the transaction. It is ultimately the buyer who has the say in whether information is material, so care must be exercised in obtaining and communicating material facts." For the purposes of this lawsuit, a transaction is the sale of a Membership or points in the U.S. Collection. Additionally, DRI sales presentations are scripted to ensure uniformity. According to the press release it issued in response to the New York Times article, DRI has a zero-tolerance policy for any sales personnel who do not follow protocol. Moreover, DRI maintains quality control over its sales personnel so that consumers who attend a sales presentation, regardless of the location, will be provided the same information as all other consumers.

93.     Beyond the duty to disclose the information memorialized in DRI's brokerage policy, Nevada real estate licensees and brokers who participated in the Membership sales transaction have a duty to disclose to all parties any material and relevant facts, data, or information, which the licensees or brokers know or should know could make a difference in the transaction. Insofar as real estate interests are implicated by Defendants' timeshare plan, that duty

1    to disclose material facts is reiterated in an approved form promulgated by the Nevada Real Estate

2    Division which is executed at the point of sale by those consumers who purchase DRI

3    Memberships in the state of Nevada.

4          94.     DRI employs high-pressure sales tactics and undue influence that is specifically

5    designed to peddle their Memberships to elderly persons. DRI used those high-pressure sales

6    tactics for the specific purpose of placing elderly persons like the Hardings and the Class members

7    under duress to coerce, annoy or harass them into buying interests in DRI Memberships. More

8    particularly, DRI has and continues to engage in the following conduct and deceptive trade

9    practices, *inter alia*:

a. Conducting "90-minute" sales presentations that typically lasted between three (3) to six (6) hours and sometimes longer;

b. Imposing constraints and hurdles to dissuade or preclude elderly persons from leaving sales presentations;

c. Refusing to allow elderly persons to take sales materials and/or offers from the sales presentations home with them to review over a reasonable period before deciding whether the purchase is appropriate or suitable for them;

d. Failing to take the necessary time to disclose to elderly persons the details of what they are buying by rushing them through the signing of closing documents;

e. Upselling additional points to a captive audience—namely, existing members and legacy members, which is a demographic often consisting of elderly persons—under the guise of alleged DRI owner updates that are just high pressure sales pitches intended to sell more points to those members;

f. Targeting a vulnerable segment of the population, namely elderly persons, *i.e.*, persons sixty (60) years of age or older, who pursuant to statute are entitled to protections from financial abuse, price gouging, and other undue influence;

g. Offering purporting "first day" incentives such as free vacations, free airline tickets, special discounts and gift cards to encourage tour attendance. Attendees are unaware prior to the sales presentation that DRI will not permit them to receive their incentives or gifts without securing their DRI sales personnel's consent to leave the sales presentation;

h. Telling elderly consumers attending DRI's sales presentations that they are receiving special discounted offers and other sales incentives that are only valid during that day's sales presentation. DRI represents to them that its offers are time

sensitive and will be withdrawn if not accepted during the sales presentation. These offers are not time sensitive. DRI simply tells elderly consumers that the offers are time sensitive to place the attendees under duress and harass or annoy them into buying a DRI Membership;

i.   Telling elderly consumers that DRI's points will increase in value or price, while failing to disclose that DRI's points lack pricing integrity and have no resale value;

j.   Failing to adequately disclose that DRI members may not advertise online to rent their points to other; and

k.   Failing to adequately disclose material information relevant to the mandatory THE Club Membership, including, *inter alia*, that Nevada law, which DRI's contracts provide as controlling, NRS 598.880 prohibits memberships such as THE Club from being perpetual in nature, and in fact limit them to a maximum two-year contract.

**DRI's Material Omissions of Fact**

95.    DRI knew or should have known that the Hardings and Class members would rely upon DRI to disclose all material facts in connection with the sale of Memberships in DRI's Collections.  However, to avoid impeding sales, and to induce elderly persons to purchase DRI Memberships on the day of the sales presentation, DRI failed, pursuant to its sales personnel's uniform training, to disclose, *inter alia*, the following information that reasonable consumers would have wanted to know in making their purchasing decisions:

a.   Despite DRI's sales presentations' focus on the elder consumers' desire to vacation at one of DRI's high value or premium accommodations, DRI fails to advise their elderly consumers, *inter alia*, that

i.   DRI's inventory of such high value or premium accommodation is inadequate to satisfy the reasonable demands of its members;

ii.  the star-ratings of most of DRI's inventory is not consistent with the representative samples promoted by DRI;

iii. the likelihood of a new member successfully booking a desired accommodation is significantly low, particularly at high value or luxury properties in the DRI portfolio; or

iv.  DRI does not own all the timeshare units in some of its resort properties, but instead only owns fractional interests in some of its properties, which reduces DRI members' chances of securing room reservations at these properties.

b.  Despite DRI telling elderly consumers that one of the benefits of purchasing DRI Memberships is that their points can also be used to purchase "Other Redemption Opportunities," such as flights, rental cars, hotels, or cruises, DRI fails to advise their elderly consumers that using points to make such purchases is economically imprudent as the cost for such purchases is not comparatively lower, and may be more expensive, than if elderly consumers were to purchase those same "Opportunities" outside of their Membership;

c.  Despite DRI's references to its Memberships as investments and a purchase in a real estate interest, DRI fails to advise their elderly consumers that:

i.  no active, organized, or liquid secondary or resale market for DRI Memberships exists or can exist, which means DRI members are saddled with their Memberships for life;

ii.  they will probably not be able to sell or even give it away for free; or

iii.  DRI severely limits the criteria and circumstances under which it will consent to allow Memberships to be transfer to another person;

d.  Despite offering to and issuing "mortgages" to elderly consumers unable or willing to otherwise pay for a Membership, DRI fails to disclose to its elderly consumers that

i.  DRI issues such loans without conducting customary due diligence or using traditional ratios employed by banks, mortgage companies, and other lenders to determine the suitability of the loan for a real estate transaction; or

ii.  Even though it will issue to them 1098 tax forms, the high interest they

pay on their DRI "mortgage" is not tax deductible

e.  Despite explaining that DRI's Membership program centers on the value of its points, failing to disclose to its elderly consumers how those points are valued, including, *inter alia*, that its

    i.  Point's values are arbitrary and can be manipulated at will by DRI;

    ii.  Point's values are inflated in price; or

    iii.  Points lack pricing integrity;

f.  Despite pressuring elderly consumers to buy into DRI's Membership "Opportunity" and referring to it as an investment and value, DRI fails to advise its *elderly consumers, inter alia*, that

    i.  There is no economic justification for an elderly consumer, i.e., a person 60 years of age or older, to buy a DRI Membership, as the purported value of a Membership is far outweighed by perpetual, limitless fees and costs tied to that Membership;

    ii.  The Membership is a net liability rather than an asset or investment;

    iii.  Anyone can easily book the same accommodations or accommodations that are substantially equivalent to the representative samples promoted by DRI through other vendors like Expedia.com or Booking.com; or

    iv.  The cost of booking the same accommodations or accommodations that are substantially equivalent to the representative samples promoted by DRI through other vendors is the same or substantially less than what DRI members pay for a room on a per diem basis;

g.  Despite touting the benefits as being benefits of DRI Membership, DRI fails to disclose to elderly consumers that some of those touted benefits are not actually tied to a Collection Membership, but rather are exclusive to the tied and mandatory THE Club Membership;

h. Despite requiring the elderly consumer to pay purported "Closing Costs" of 3.5% of the price of the Membership, DRI fails to disclose to its elderly members that

    i. Such costs are not justified and do not reflect actual, out of pocket, variable expenses incurred by DRI; or

    ii. Such costs are not associated with the sale of deeded real property;

i. Despite portraying annual maintenance fees as a minor expense, DRI fails to disclose to its elderly consumers that

    i. DRI's maintenance fees rise at a rate greater than inflation as measured by the consumer price index;

    ii. DRI's maintenance fees lack transparency, in that DRI includes charges in its maintenance fee assessments that would customarily be inappropriate or unjust to pass along to a timeshare member; or

    iii. DRI (or one of its subsidiaries) is also the property manager at all of DRI's resorts and for that additional role is paid on a cost-plus basis, which means DRI has a financial incentive to maximize maintenance fees so that it may collect its percentage of those fees as property management fees.

96.     DRI's material non-disclosures would impact a reasonable elderly person's willingness to purchase a DRI Membership. Had the above material information been disclosed to elderly consumers, including the Hardings and the Class members, they would have never purchased points in DRI's vacation club, or, at a minimum, would not have paid a price premium.

97.     If any of the material information referenced in the preceding paragraphs and throughout this Complaint had been disclosed to the Hardings and the Class members during the sales presentations they attended, they never would have bought a DRI Membership or at least would not have paid such a premium price for it. The Hardings and the Class members relied on

DRI to tell the truth and make full disclosure of all material facts. DRI's failure to disclose all material information was, and continues to be, a producing or proximate cause of the damages suffered by the Hardings and the Class members.

98.     DRI's intentional or knowing failure to disclose all material facts cited in this Complaint was a producing and/or proximate cause of the damages suffered by the Hardings and the Class members.

## ALLEGATIONS CONCERNING THE PLAINTIFFS

99.     Plaintiffs are Ilona Harding, age 76, and Thomas Harding, age 74.  The Hardings are consumers. They are neither sophisticated businesspeople nor attorneys.

### The Hardings Original DRI Membership Purchase

100.    On or about January 29, 2013, DRI invited the Hardings and other members of a competing vacation club, Monarch, to attend a 90-minute dinner in Scottsdale, Arizona. DRI sponsored the event under the guise of giving the attendees an update on Monarch (the "Monarch Update Dinner").  The dinner was scheduled to begin around 6:00 p.m. and only last 90 minutes. Unbeknownst to the Hardings, the dinner turned out to be a DRI sales presentation.

101.    During that sales presentation, DRI's agents told the attendees, including the Hardings, that Monarch was in financial trouble and their Monarch memberships would eventually become useless. DRI offered to buy the attendees' interests in Monarch if the consumer- attendees bought a DRI Membership in return.  By doing so, DRI created incentives for the attendees to try to salvage some value in their Monarch club memberships.

102.    DRI told the attendees that DRI offered access to approximately 100 different resort properties in its portfolio of Collections. In comparison, Monarch only had about 10 different resort properties in its club. DRI bragged that it was one of the largest and most reputable timeshare clubs in the hospitality industry during the presentation.

103.    The Hardings had no intention of buying a DRI Membership when they arrived at the Monarch Update Dinner, as they were satisfied with their existing Monarch membership. While the event began on time, it lasted until midnight—six hours, instead of the promised 90

minutes.  During six hours of DRI's group and individual sales presentations, DRI made numerous and repeated attempts to convince the Hardings to purchase a DRI Membership.  Even though DRI, with each successive offer, lowered its asking price, the Hardings repeatedly rejected those offers and told DRI that they were not interested in buying a DRI Membership.

104.    Despite the Hardings' repeated rejections and request for more time to consider and study DRI's offers, DRI sales agents continued to pressure them to buy a Membership. DRI made its offer time sensitive. More particularly, DRI told the Hardings that they had to accept its offer while they were still attending the event. DRI also told the Hardings that if they left the event without buying a Membership, then any of DRI's offers to sell them a Membership (including DRI's offer to buy their membership in Monarch) for the discounted prices quoted that evening would expire and automatically be withdrawn.  At or around midnight—after six grueling hours— DRI was finally able to wear-down the Hardings and convince them that they "needed" to purchase a DRI Membership—*Vacations for Life*® to a couple in their 70s.

105.    By engaging in this conduct, DRI knowingly and intentionally placed the Hardings under duress. DRI also intentionally exercised undue influence over the Hardings, harassed them, and annoyed them until the Hardings accepted DRI's offer.

106.    As a direct result of DRI's continuing sales pressure, the Hardings eventually agreed to buy a DRI Membership. In fact, the Hardings were still signing closing documents at midnight.  The final terms of the sale were as follows. DRI sold the Hardings an annual allotment of 10,500 points in the U.S. Collection. In exchange, the Hardings conveyed their Monarch membership to DRI for a $22,812 credit. The Hardings also agreed to pay the sum of $7,895. Lastly, the Hardings paid Closing Costs in the amount of $319.

107.    DRI Memberships are perpetual in nature. By joining DRI's U.S. Collection, the Hardings not only paid DRI the original purchase price of the Membership, but DRI also obligated the Hardings to pay annual maintenance fees, Club dues and special assessments and fees for the rest of their lives.

108.    The Hardings' mandatory maintenance fees for the first year were approximately

1    $1,700, regardless of whether the Hardings could successfully book or use a DRI accommodation

2    that they wanted to visit.

3         109.    Notwithstanding DRI's purported multi-site property portfolio and flexibility, the

4    Hardings eventually discovered that they could not book rooms at resort locations they wanted to

5    visit.  For example, the Hardings could not reserve or book properties in Washington or at

6    California beach locations despite numerous attempts.  Each time the Hardings went through

7    DRI's reservation system, they were told that those locations were 100% booked.

8                             **The Silver Sampler Upsell**

9         110.    In August 2013, the Hardings used some of their DRI Membership points for a trip

10   to Orlando, Florida. While they were there, DRI required the Hardings to attend another DRI sales

11   presentation that was only supposed to last 90 minutes (the "Orlando Sales Presentation").  DRI

12   advised the Hardings that the purpose of the presentation was to update them about all of the

13   wonderful opportunities DRI had to offer its members.  DRI did not allow the Hardings to leave

14   the sales presentation until it was finished—a time unilaterally determined by DRI.

15        111.    At the Orlando Sales Presentation, DRI recommended that the Hardings buy a

16   "Silver Sampler" package.  As an incentive, DRI offered the Hardings the use of "free rooms" in

17   Hawaii (airfare not included) if the Hardings agreed to "upgrade" their existing DRI Membership

18   by purchasing more annual points.  DRI guaranteed a "price lock" of $4 per point for one year if

19   the Hardings later decided to go to "full Silver" status.

20        112.    The Orlando Sales Presentation again lasted many hours longer than the 90 minutes

21   DRI promised. Like the original DRI sales presentation that the Hardings attended in Scottsdale,

22   Arizona, DRI unleashed numerous sales agents on the Hardings to convince them to upgrade their

23   existing DRI Membership. Even though the Hardings repeatedly told the DRI sales agents that

24   they were not interested in upgrading, DRI's sales agents were relentless.  Each time the Hardings

25   told DRI's sales agents that they were not interested in upgrading their Membership, DRI sent out

26   a new set of salesmen to try to convince the Hardings that they needed to buy more points to take

27   full advantage of the "wonderful opportunities" DRI claimed it provided its members.  DRI also

28

told the Hardings that the cost of DRI points would only increase over time, so the Hardings should buy more points now instead of waiting to buy them later when the points would be more expensive. Moreover, DRI offered the Hardings the use of a free room in Hawaii as an incentive to upgrade their Membership.

113.    After several hours of listening to many DRI sales agents repeatedly trying to convince them to upgrade, the Hardings succumbed to the effects of the cumulative sales pressure. In other words, the Hardings agreed to "upgrade" their DRI Membership. The Hardings paid DRI the sum of $15,905 to buy more points and get the use of a free room in Hawaii.  Of course, this purchase also had the effect of raising the Hardings' annual maintenance fees because DRI charges maintenance fees, in large part, based on the number of annual points a member owns.

### The Hawaii Collection Upsell

114.    In May 2014, the Hardings traveled to Hawaii so that they could use the free room DRI promised them while they were in Orlando. Unfortunately, the "free" room DRI offered the Hardings was not really free. First, the Hardings had to pay for their own transportation to get to Hawaii. Second, DRI required the Hardings to attend another DRI sales presentation that DRI claimed would only last 90 minutes.  The Hardings did not want to attend another one of DRI's sales presentations, but DRI threatened to punish the Hardings by making them pay for the entire cost of their supposedly free lodging if they either (a) failed to attend the mandatory sales presentation; or (b) left the sales presentation early without DRI's consent.  DRI's threat created a powerful incentive for the Hardings to stay for the duration of the sales presentation, even though it lasted many hours longer than DRI represented.

115.    After attending the sales presentation for many hours beyond the time promised and dealing with numerous, high pressured sales pitches, the Hardings again broke down and agreed to buy a new Membership in DRI's "Hawaii Collection" at $4 per point—a price DRI's agents claimed was an unheard-of bargain price.  Although the Hardings had no intention of buying any more points from DRI, DRI's non-stop sales pressure eventually convinced the Hardings that they would be foolish not to buy into the Hawaii Collection.  More particularly, DRI told the

Hardings that the cost of points in the Hawaii Collection was rapidly rising each year, so $4 per point was a "steal." Additionally, DRI advised the Hardings that by switching collections and buying the additional points, the Hardings would reach "full Silver status," which would supposedly entitle them to preferential treatment in reserving rooms in the highly-coveted location of Hawaii.

116. As part of the deal, the Hardings traded in their Membership in DRI's U.S. Collection, plus they paid DRI an additional $10,222 for the purported privilege of joining the Hawaii Collection. As a result of this upgrade, the Hardings' annual maintenance fees increased to $2,257.

117. Despite this "upgrade" into the Hawaii Collection and reaching Silver status, the Hardings soon discovered that they still could not reserve rooms at locations they wanted to visit. For example, during their Hawaii Membership with DRI, the Hardings still could not book rooms at the Great Wolf Lodge in Washington or at DRI properties along the California coast where nearby beaches are located.

### The Palm Springs Upsell

118. In August 2015, a mere three months later, the Hardings vacationed at a DRI property located in Palm Springs, California. Because the Hardings were not Gold members, DRI once again required them to attended yet another purported 90-minute, compulsory DRI sales presentation during their stay.

119. While they were at that Palm Springs sales presentation, DRI convinced the Hardings that they had made a big mistake by joining the Hawaii Collection. DRI explained to the Hardings that the Hawaii Collection's maintenance fees were higher than maintenance fees in the U.S. Collection because the Hawaii Collection's properties were more vulnerable to storm damage. Additionally, members in the Hawaii Collection are responsible for paying the cost to repair those damages. Finally, DRI told the Hardings that the Hawaii Collection was notorious for making special assessments on its members much more frequently than the U.S. Collection. DRI then "offered" the Hardings the opportunity to "get out" of the Hawaii Collection by once again

upgrading their Membership and rejoining the U.S. Collection at an even higher and more expensive level than they were at previously.

120.    DRI also told the Hardings that by purchasing more points at that time, they could lock in lower prices for those points. More particularly, DRI told the Hardings that it expected the value and, by extension, the cost of points to rapidly rise in the future. Also, DRI said that the amount of points the Hardings owned did not give them their full potential to take advantage of all the wonderful services that DRI had to offer, but, upgrading again would.

121.    The Hardings trusted DRI because the sales agents repeatedly told the Hardings that they were licensed real estate brokers who had a duty to tell the truth and disclose all material facts that a consumer would deem important.  The Hardings relied on the advice of the DRI sales agents and switched back to the U.S. Collection.

122.    The Hardings believed DRI when it said that rejoining the U.S. Collection was a smart move and that the Hardings should take advantage of the opportunity to switch collections while they had the chance to do so.  Once again, by upgrading their Membership, the Hardings' annual maintenance fees increased.

123.    Even though the Hardings rejoined the U.S. Collection with an even higher number of points than before their Membership in the Hawaii Collection, the Hardings learned that they still could not book a room at a DRI property where they actually wanted to vacation.  For example, after the Hardings upgraded their Membership by rejoining the U.S. Collection, while they were in Palm Springs, the Hardings still could not access the Great Wolf Lodge in Washington or California properties along the coast, which are located close to beaches.

**The Nevada Gold Upsell**

124.    In December 2015, the Hardings attended another mandatory DRI sales presentation while they vacationed at the Polo Towers in Las Vegas, Nevada. During that sales presentation, DRI ultimately offered to give the Hardings a one-time bonus of 15,000 points if they agreed to upgrade their Membership to full Gold status. The supposed 90-minute sales presentation dragged on and on. Once again, the Hardings dealt with what seemed like a never-ending stream

of sales agents. As had happened before at the other DRI sales presentations, each new set of DRI sales agents told the Hardings that they needed to upgrade their existing DRI Membership so they could take advantage of all the vacation opportunities that DRI had to offer. In addition to receiving 15,000 bonus points, DRI told the Hardings that one advantage of upgrading to full Gold status was that they would never again have to attend a mandatory DRI sales presentation.

125.    Based on the promises and assurances that the DRI sales agents made, the Hardings decided to upgrade their Membership one last time. The Hardings had hoped that by reaching full Gold status they could actually use their points to book rooms at the specific locations they wanted to visit when they wanted to visit, *i.e.*, Washington and California resorts near the beach. Moreover, the Hardings had already invested so much money in their DRI Memberships that they felt desperate. The Hardings found themselves in a dilemma. On the one hand, if they did not follow DRI's advice and upgrade one more time, the Hardings believed that all of the money they had expended on their DRI Memberships to date would have been wasted. On the other hand, if the Hardings did upgrade one more time, they would have to spend even more money.

126.    The Hardings decided to trust DRI one more time and make that final upgrade in December 2015.  The Hardings trusted DRI because one of its trade names and mottos are that DRI is the company of "YES!" As such, DRI touts that its corporate philosophy is to make sure that its members get what they want in reserving rooms.

127.    Additionally, during each and every sales presentation they had attended, DRI's sales agents told the Hardings that they were licensed real estate agents who have a duty to tell the truth and disclose all material facts to consumers like them. Moreover, the DRI sales agents had repeatedly told the Hardings that full and fair disclosure of all material information was vital for consumers to have so that they could make informed decisions whether to buy a DRI Membership. The DRI's sales agents also repeatedly told the Hardings that failure to tell the complete truth or withhold material facts would expose DRI and its real estate agents to serious liability.  DRI emphasized that it was on the Hardings' side and only wanted what was best for them. As such, DRI told the Hardings that they could trust DRI not to omit any material facts pertaining to owning

a DRI Membership.

128.    The DRI sales agents in Las Vegas had even showed the Hardings a form promulgated by the State of Nevada called "Duties Owed By A Nevada Real Estate Licensee." That form requires real estate licensees or agents to tell the truth and make full disclosure of all material facts when selling DRI Memberships. Both the Hardings and the DRI real estate agents signed the form as part of the sales process. Signing the form reinforced the Hardings' belief that DRI was telling the truth and not withholding any relevant or material information pertaining to the risks of owning a DRI Membership.

129.    After seven hours of intense sales pressure, and being exhausted and beaten down emotionally, the Hardings reluctantly agreed to upgrade their Membership to full Gold status. DRI had convinced the Hardings that with this one last upgrade they finally would be able to use their points to vacation where they wanted and when they wanted.

130.    The Hardings are not wealthy individuals. They did not have the money to pay for the upgrade by using cash or a check. As such, DRI offered to finance their purchase. Specifically, DRI told the Hardings to take out a "mortgage" through DRI's lending arm.  The principal amount of the "mortgage" was $36,119.66.  The interest rate that DRI charged on the loan was 12.2764% and the loan was for a term of 10 years. Monthly payments totaled $524.  Upon information and belief, DRI did not conduct any meaningful due diligence to see if the Hardings could reasonably afford to pay that monthly note. DRI never asked the Hardings to provide information about their income, assets, or debts before issuing the mortgage.  Nor did DRI require any proof of income to approve the Hardings' loan.  DRI approved the loan in a matter of minutes.  Furthermore, in upgrading their Membership in Las Vegas, DRI even issued the Hardings a pre-approved DRI Barclay credit card right there on the spot so the Hardings could even borrow the money for their down payment by charging the $5,970 down payment in a supposedly hassle-free manner.

131.    Even though DRI told the Hardings that by reaching full Gold status they would have an easier time booking rooms at the destinations they wanted to visit, that promise never materialized.  By the end of 2015, the Hardings became increasingly frustrated with DRI.  As

discussed above, despite having paid approximately $75,000 to DRI to purchase points plus thousands of dollars more each year in maintenance fees, the Hardings were unable to reserve rooms at resort locations they wanted to visit, such as properties in Washington and California. The Hardings' inability to reserve rooms at locations they wanted to visit at a time they wanted to visit had been an ongoing problem and source of great stress and frustration.  Although the Hardings have followed the DRI reservation system instructions in trying to book accommodations in places like Washington and California, the Hardings were never able to book a room there.  Each time they tried to make a reservation at one of those locations, the Hardings discovered that the properties had been 100% booked as much as a full year in advance.  In other words, no vacancies ever existed at the properties that the Hardings wanted to use despite their extremely expensive full Gold status.

132.   In January 2016, the Hardings received a bill from DRI for their annual maintenance fees. The Hardings' DRI maintenance fees for 2016 had risen more than 300% from their original fee of $1,700 to $5,173.

133.   Since the primary source of the Hardings' income is their social security benefits and interest from their modest savings, the Hardings found themselves in financial trouble.  Not only were the Hardings paying exorbitant maintenance fees, but they also were and still are obligated to pay off a $36,000 loan and $6,000 down payment, both of which charge credit card level interests. Unfortunately, the Hardings cannot refinance that loan at the lower interest rates that are customarily charged for residential properties.

134.   By early 2016, the Hardings had lost all confidence in DRI. The Hardings decided that they needed to immediately sell their DRI Membership.  When the Hardings investigated how much money they could sell their prestigious Gold Membership in the U.S. Collection for, the Hardings were shocked to learn that there was no viable secondary market where they could sell their DRI Membership, a fact DRI never told them. Additionally, the Hardings learned that they could not even give away their Membership for free.  The Hardings finally realized that they had been scammed by DRI.

135.    Each time the Hardings purchased a DRI Membership, they were handed a thick stack of legal documents to review and sign right there at the sales presentation. The Hardings are neither lawyers nor speed-readers. One of the documents that the Hardings were required to sign before having an opportunity to read or understand it is called a "Purchase and Security Agreement" (hereafter "PSA"). The PSA is the primary governing document between the Hardings and DRI. It is a contract of adhesion drafted solely by DRI. It is written in legalese so that elderly persons like the Hardings cannot understand what they are signing or buying, especially under the conditions under which DRI places its customers.

136.    DRI's practices, which are standard to the Class, placed the Hardings under duress during the signing process. Specifically, DRI did not allow the Hardings to take the closing documents home to read or study before signing them. Instead, after 6 and 7 hours of badgering the Hardings to get the upsell, DRI rushed the exhausted Hardings through the signing process before allowing them to leave the sales presentations. This coercion is standard protocol that DRI followed whenever the Hardings and others joined, upgraded, or switched a DRI Collection. Simply put, DRI did not take the necessary amount of time to disclose all material information relevant to the transaction that a reasonable consumer would want to know, nor did it explain to the Hardings or putative Class members all of the material terms and conditions of buying a DRI Membership during the signing process. The reason for DRI's intentional conduct is simple. DRI wants the sale closed right there on the spot without any delay.  Many of the terms in buying a DRI Membership are oppressive and burdensome to elderly consumers like the Hardings. Moreover, DRI does not want elderly consumers like the Hardings to know what they are signing. DRI intentionally failed at every sales presentation that the Hardings attended to disclose all material facts, which, if known by the Hardings, would have dissuaded them from ever buying a DRI Membership and/or paying a price premium for points.

137.    Although the Hardings have used their points at some DRI resort properties, the Hardings were never able to book rooms at the luxury or premium resorts they actually wanted to go despite having paid DRI approximately $75,000 just to buy points in DRI's U.S. and Hawaii

Collections. Stated differently, the Hardings did not pay DRI their hard-earned money and a portion of their life savings so that they could book rooms at a two- (2) or three- (3) star resort located a few miles from where they live in Arizona.

138.     Unbeknownst to the Hardings, they could have booked the exact same DRI rooms (or accommodations of like kind and quality) by logging on to the internet and making room reservations on a website like Booking.com or Expedia.com for approximately $100-$150 per night or less. The Hardings could have done this without having to pay DRI's outrageous Membership fees. Moreover, the Hardings could have booked those exact same DRI rooms (or accommodations of like kind and quality) without obligating themselves to pay exorbitant annual maintenance fees, Club dues, and other assessments in perpetuity.

139.     On or about October 11, 2016, the Hardings made written demand on DRI properly exercising their rights to opt-out of the ARBITRATION PROVISION found in paragraph 18 of the PSA and its attendant class action ban, ban on private attorney general actions, and ban on aggregating multiple plaintiff claims. The Hardings also demanded the return of all monies or other consideration they have paid DRI. To date, DRI has not responded to the Hardings' demand and, therefore, has refused to refund their money. Moreover, DRI ignored the Hardings' request that DRI provide them with certain documents in their file. Accordingly, all conditions precedent to filing this Complaint have now been satisfied.

## CLASS ACTION ALLEGATIONS

140.     Plaintiffs re-allege and incorporate herein by this reference all the paragraphs above in this Complaint as though fully set forth herein.

141.     Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(b)(3), or in the alternative Rule 23(c)(4), on behalf of themselves and all others similarly situated, as representative members of the following "Proposed Class":

> All persons who were 60 years of age or older when they purchased a Membership interest with Diamonds Resorts International through Diamond Resorts U.S. Collection Development, LLC, within the applicable statute of limitations period and who have not received a full refund of monies or other

consideration they paid the Defendants.

142.    Excluded from the Class are (a) any consumers who relinquished and/or surrendered their Membership interest and affirmatively released DRI from liability; and (b) Defendants and any entity in which they have a controlling interest or which is a parent, subsidiary or affiliate of or is or was controlled by any Defendant entity, and their past and current officers, directors, managers, employees, affiliates, agents, legal representatives, heirs, predecessors, successors, and assigns.

143.    *Numerosity*: The members of the proposed Class are so numerous and geographically dispersed that individual joinder of all members is impracticable under the circumstances of this case, and the disposition of their claims as a Class will provide substantial benefits to the parties, Class members, and the Court. Although the precise number of Class members and their names are presently unknown, this information can be readily determined from a review of DRI's records. Upon information and belief, the Class includes thousands of senior persons.

144.    *Commonality/Predominance*: Common questions of law or fact are shared by the members of the proposed Class. This action is suitable for class treatment because these common questions of fact and law predominate over any questions affecting individual members. These common legal and factual questions, include, *inter alia*:

- Whether DRI's business practices constitute violations of the Nevada Time Share Statutes, N.R.S. 119A.010, *et seq*., including:
  - i.   Whether DRI's "Public Offering Statement" omits material information as set forth above;
  - ii.  Whether DRI made material omissions in connection with the sales and marketing of its timeshare plan as set forth above;
- Whether DRI can be held liable for the actions of its sales agents;
- Whether Defendants are jointly and severally liable for their actions, misrepresentations, and omissions;

- Whether Defendants omitted to disclose material information to Plaintiffs and the Class, and whether Plaintiffs and the Class have sustained injury by reason of Defendants' actions, misrepresentations, and omissions;

- Whether consumers were fraudulently induced into purchasing a Membership;

- Whether DRI engaged in negligent misrepresentations thereby causing damage to the Class members;

- Whether DRI breached the covenant or duty of good faith and fair dealing thereby causing damage to the Class members

- Whether Plaintiffs and the Class are entitled to rescission and/or other equitable relief; and

- Whether Plaintiffs and other members of the Class are entitled to recover damages and the amount of damages that members of the Class are entitled to recover.

145.   *Typicality*: Plaintiffs' claims are typical of those of the proposed Class, and are based on and arise out of uniform misrepresentations and omissions as described above. If litigated individually, the claims of each Class member would require proof of the same material and substantive facts, rely upon the same remedial theories, and seek the same relief. There will also be no difficulty in the management of this litigation as a class action.

146.   *Adequacy*: Plaintiffs are adequate representatives of the proposed Class because Plaintiffs are members of the Class they seek to represent and their interests do not conflict with the interests of the other members of the Class Plaintiffs seek to represent. Plaintiffs have retained counsel that are competent and experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel. Neither Plaintiffs nor their counsel have interests that are contrary to, or conflicting with, the interests of the proposed Class.

147.   *Superiority*: A class action is superior to other available methods for the fair and efficient adjudication of the controversy, because, *inter alia*, it is not economically feasible for

Class members to prosecute individual actions of their own given the amount of damages at stake for each individual relative to the substantial costs associated with litigation. Important public interests will be served by addressing the matter as a class action. The cost to the court system and the public for the adjudication of individual litigation and claims would be substantially more than if the claims were treated as a class action. Prosecution of separate actions by individual of the Class would create a risk of inconsistent and/or varying adjudications with respect to the individual members of the Class, establishing incompatible standards of conduct for Defendants and resulting in the impairment of the Class members' rights and the disposition of their interests through actions to which they were not parties. The issues in this action can be decided by means of common, class-wide proof. In addition, if appropriate, the Court can and is empowered to fashion methods to efficiently manage this action as a class action.

148.    Because the elements of Rule 23(b)(3), or in the alternative Rule 23(c)(4), are satisfied in the case, class certification is appropriate.

## FIRST CLAIM FOR RELIEF

### Violation of Nevada Deceptive Trade Practices Act
### Failure to Disclose and Duress

149.    All preceding paragraphs in this Complaint are re-alleged and incorporated by reference as though fully set forth herein.

150.    DRI is engaged in advertising as defined in section N.R.S. 598.0905 the Nevada Deceptive Trade Practice Act.

151.    N.R.S. 598.0933 defines an "Elderly person" to mean a person who is 60 years of age or older. Accordingly, the Hardings and all Class members are deemed to be elderly persons as defined by the Nevada Deceptive Trade Practice Act.

152.    N.R.S. 598.0977 provides that if an elderly person suffers damage or injury as a result of a deceptive trade practice, said elderly person may commence a civil action.

153.    DRI violated N.R.S. 598.0918(2) because DRI engaged in a "deceptive trade practice" by repeatedly or continuously conducting its sales presentations in a manner that would

be considered by a reasonable person to be annoying, abusive or harassing. DRI's conduct caused damages to the Hardings and the Class members because DRI sold them Memberships in the U.S. Collection that the Hardings and the Class members would not have purchased but for DRI's deceptive trade practices.

154. DRI violated N.R.S. 598.0923(2) because DRI engaged in a "deceptive trade practice" when, in the course of its business, DRI failed to disclose one or more of the material facts identified above in connection with the sale or lease of goods and services to the Hardings and the Class members. Specifically, DRI's conduct caused damage to the Hardings and the Class members because DRI sold them Memberships in the U.S. Collection that the Hardings and the Class members would not have purchased but for DRI's deceptive trade practices.

155. DRI violated N.R.S. 598.0923(4) because DRI engaged in a "deceptive trade practice" when, in the course of its business, DRI knowingly used undue influence, duress, coercion or intimidation to sell DRI Memberships in the U.S. Collection to the Hardings and the Class members. More particularly, DRI's conduct caused damage to the Hardings and the Class members because DRI sold them Memberships in the U.S. Collection that the Hardings and the Class members would not have purchased but for DRI's deceptive trade practices.

156. DRI violated N.R.S. 598.0915(5) because DRI engaged in a "deceptive trade practice" when, in the course of its business, DRI knowingly made one or more false representations as to the characteristics, ingredients, uses, benefits, alterations, or quantities of goods or services for sale or lease or one or more false representations as to the sponsorship, approval, status, affiliation or connection of a person therewith. More particularly, DRI's conduct caused damage to the Hardings and the Class members because DRI sold them Memberships in the U.S. Collection that the Hardings and Class members would not have purchased but for DRI's deceptive trade practices.

157. DRI violated N.R.S. 598.0915(6) because DRI engaged in a "deceptive trade practice" when, in the course of its business, DRI knowingly represented that goods for sale or lease are original or new when DRI knew or should have known, but failed to disclose that they

were deteriorated, altered, reconditioned, reclaimed, used or secondhand. DRI's conduct caused damage to the Hardings and the Class members because DRI sold them Memberships in the U.S. Collection that the Hardings and Class members would not have purchased but for DRI's deceptive trade practices.

158.   DRI violated N.R.S. 598.0915(7) because DRI engaged in a "deceptive trade practice" when, in the course of its business, DRI knowingly represented that goods or services for sale or lease are of a particular standard, quality or grade, or that such goods are of a particular style or model, when DRI knew or should have known that they are of another standard, quality, grade, style or model. DRI's conduct caused damage to the Hardings and the Class members because DRI sold them Memberships in the U.S. Collection that the Hardings and Class members would not have purchased but for DRI's deceptive trade practices.

159.   DRI violated N.R.S. 598.0915(9) because DRI engaged in a "deceptive trade practice" when, in the course of its business, DRI advertised goods or services with intent not to sell or lease them as advertised. DRI's conduct caused damage to the Hardings and the Class members because DRI sold them Memberships in the U.S. Collection that the Hardings and Class members would not have purchased but for DRI's deceptive trade practices.

160.   DRI violated N.R.S. 598.015(10) because DRI engaged in a "deceptive trade practice" when, in the course of DRI's business, DRI advertised goods or services for sale or lease with intent not to supply reasonably expectable public demand. DRI's conduct caused damages to the Hardings and the Class members because DRI sold them Memberships in the U.S. Collection that the Hardings and the Class members would not have purchased but for DRI's deceptive trade practices.

161.   DRI violated N.R.S. 598.015(13) because DRI engaged in a "deceptive trade practice" when, in the course of DRI's business, DRI made false or misleading statements of fact through omission concerning the price of goods or services for sale or lease, or the reasons for, existence of or amounts of price reductions. DRI's conduct caused damages to the Hardings and

the Class members because DRI sold them Memberships in the U.S. Collection that the Hardings and the Class members would not have purchased but for DRI's deceptive trade practices.

162.    DRI violated N.R.S. 598.0915(15) because DRI engaged in a "deceptive trade practice" in the course of DRI's business. As recited in detail above, DRI knowingly made one or more false representation(s) and/or material omission(s) in the sale of Memberships in the U.S. Collection. More particularly, DRI's conduct caused damages to the Hardings and the Class members because DRI sold them Memberships in the U.S. Collection that the Hardings and the Class members would not have purchased but for DRI's deceptive trade practices. DRI's violation(s) of N.R.S. 598.0915(5), (6), (7), (9), (10), (13), and (15), whether singularly or collectively caused damages to the Hardings and the Class members as set forth more fully above.

163.    DRI violated N.R.S. 598.092(5)(c) because DRI engaged in a "deceptive trade practice" in the course of DRI's business. More particularly, DRI made one or more untrue statements of a material fact or omitted to state one or more material facts which were necessary to make another statement, considering the circumstances under which they were made, not misleading. More particularly, DRI's conduct caused damages to the Hardings and the Class members because DRI sold them Memberships in the U.S. Collection that the Hardings and Class members would not have purchased but for DRI's deceptive trade practices.

164.    The Hardings and the Class members seek to recover from DRI all actual damages, punitive damages, civil penalties, treble damages and attorney's fees allowed by law arising out of DRI's violations of the Nevada Deceptive Trade Practices Act, N.R.S. 598, *et seq*.

165.    The Hardings and each putative Class member also seek to recover any and all civil penalties to which they are entitled under N.R.S. 598.0973, *et seq*., against DRI for engaging in deceptive trade practices that were directed toward elderly persons.

## SECOND CLAIM FOR RELIEF

### Fraud in the Inducement

166.    All preceding paragraphs in this Complaint are re-alleged and incorporated by reference as though fully set forth herein.

167.     The Hardings and Class members will show that DRI committed fraud in the inducement or fraud by omission of material fact when DRI sold them Memberships in the U.S. Collection as set forth more fully above. More particularly, the Hardings and Class members will show the following: (a) DRI knew or should have known that the representations it made, and in particular, the omissions of material fact DRI made to the Hardings and Class members were false; (b) DRI intended to induce the Hardings and Class members to buy Memberships in the U.S. Collection by failing to make one or more material representations as set forth above; and (c) The Hardings and the Class members justifiably relied on DRI to make full and fair disclosure of all material facts in connection with the sale of Memberships in the U.S. Collection. The Hardings and Class members detrimentally relied on DRI's omissions of material fact thereby causing them damages. Stated differently, but for DRI's fraud in the inducement, the Hardings and the Class members would not have purchased Memberships in DRI's U.S. Collection.

168.     The Hardings seek rescission of their DRI Memberships as well as restitution for all sums of money or other consideration paid to DRI. Alternatively, the Hardings and the Class members seek recovery of any and all monetary damages they have suffered as a result of DRI's fraud in the inducement.

## **THIRD CLAIM FOR RELIEF**

### **Negligent Misrepresentation**

169.     All preceding paragraphs in this Complaint are re-alleged and incorporated by reference as though fully set forth herein.

170.     Defendants had a duty to disclose and, at all relevant times, failed to disclose and/or concealed material facts by omitting material information known to Defendants and by making partial representations of some material facts when Defendants had knowledge of qualifying or contrary material facts.

171.     In the absence of disclosure of relevant qualifying or contrary material facts, DRI supplied Plaintiffs and Class members with false information.

172.    During DRI's sales presentations and transactions with elderly consumers, DRI intentionally omitted material information.

173.    Defendants' repeated material omissions caused the Hardings and the Class members to justifiably rely upon false information.

174.    The Hardings and the Class members justifiably relied upon and consummated transactions based on the omission of certain material information detailed above.

175.    As a result of Defendants' negligent misrepresentation and/or failure to disclose material information, the Hardings and the Class members have suffered damages.

176.    The Hardings seek rescission of their DRI Memberships as well as restitution for all sums of money or other consideration paid to DRI. Alternatively, the Hardings and the Class members seek recovery of any and all monetary damages they have suffered as a result of DRI's negligent misrepresentation.

### FOURTH CLAIM FOR RELIEF

**Breach of Implied Covenant of Good Faith and Fair Dealing**

177.    All preceding paragraphs in this Complaint are re-alleged and incorporated by reference as though fully set forth herein.

178.    A covenant of good faith and fair dealing is implied in the timeshare contracts (also known as a Purchase and Security Agreement or PSA) entered into between DRI and the Hardings and the Class members.  The Hardings and the Class members entered into such timeshare contracts in order to buy points in DRI's Memberships and to secure financing for their timeshare purchases.  Implied terms in the timeshare contracts, necessary to provide the Hardings and the Class members with the benefit of their bargains, provided the Hardings and the Class members the rights guaranteed by law, required by DRI to act in good faith, and prohibited DRI's arbitrary and unfair acts that worked to the disadvantage of the Hardings and the Class members, as well as prohibited material misrepresentations and omissions.

179.    DRI violated and breached its duties of good faith and fair dealing by the actions set forth herein, including the misrepresentations and material omissions arising in connection with

the sales and promotional practices recited above. By way of example, but not limitation: DRI is allowed to charge maintenance fees, however, a consumer would not anticipate that DRI would have a conflict of interest creating an incentive for DRI to increase maintenance costs as much as possible because DRI receives a percentage of those maintenance fees. Moreover, a consumer would not anticipate that escalation of maintenance fees would outpace inflation. Also, a consumer would not anticipate that maintenance fees would contain unjust charges or expenses nor would a consumer anticipate that DRI would charge unjust Closing Costs in the sale of Memberships.

180.    DRI's breach injured the Hardings and the Class members.  The Hardings and the Class members are, therefore, entitled to damages, including interest, in excess of $10,000.

181.    The Hardings seek rescission of their DRI Memberships as well as restitution for all sums of money or other consideration paid to DRI.   Alternatively, the Hardings and the Class members seek recovery of any and all monetary damages they have suffered as a result of DRI's breach of the implied covenant of good faith and fair dealing.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and all other similarly-situated members of the Class, request that this Court enter an Order:

A.    Certifying this matter as a class action pursuant to Federal Rule of Civil Procedure 23(b)(3), designating Plaintiffs as Class representatives, and appointing undersigned as Class Counsel;

B.    Declaring the practices here complained of as unlawful under appropriate law;

C.    Granting rescission of Membership agreements;

D.    Granting restitution of all funds to the Plaintiffs from the Defendants;

E.    Granting judgment to Plaintiffs and the Class members on their claims for damages, interest, attorneys' fees, and costs as applicable and appropriate;

F.    Granting civil penalties under N.R.S.598, *et seq.*, and punitive damages against DRI under N.R.S. 598.0977; and

G.    Ordering such other relief as the Court may deem necessary and just.

1

## JURY TRIAL DEMAND

2       Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial

3  by jury on all issues so triable.

4       DATED this 28th day of January, 2017.

5                                         **ALBRIGHT, STODDARD, WARNICK &**
                                          **ALBRIGHT**
6

7                                         */s/*  G. Mark Albright

8                                         G. MARK ALBRIGHT, ESQ.
                                          Nevada Bar No. 1394
9                                         CHRIS ALBRIGHT, ESQ.
                                          Nevada Bar No. 4904
10                                        **ALBRIGHT, STODDARD, WARNICK &**
                                          **ALBRIGHT**
11                                        801 South Rancho Drive, Suite D-4
                                          Las Vegas, Nevada 89106
12                                        Tel:      (702) 384-7111
                                          Fax:      (702) 384-0605
13                                        Email:  gma@albrightstoddard.com
14

15                                        KATHRYN HONECKER, ESQ.*
                                          AUDRA E. PETROLLE, ESQ.*
16                                        **ROSE LAW GROUP, PC**
                                          7144 Stetson Drive, Suite 300
17                                        Scottsdale, Arizona 85251
                                          Tel:      (480) 505-3939
18                                        Fax:      (480) 505-3925
                                          Email: khonecker@roselawgroup.com
19                                        apetrolle@roselawgroup.com
20

21                                        ROBERT C. TARICS, ESQ.*
                                          **THE TARICS LAW FIRM, P.C.**
22                                        9810 East Thompson Peak Parkway, Unit 811
                                          Scottsdale, Arizona  85255
23                                        Tel:      (480) 686-9390
                                          Fax:      (713) 682-9911
24                                        Email: rtarics@taricslaw.com
25                                        *pro hac vice pending*
26
                                          *Attorneys for Plaintiffs*
27

28