1  G. MARK ALBRIGHT, ESQ.
   Nevada Bar No. 1394
2  CHRIS ALBRIGHT, ESQ.
   Nevada Bar No. 4904
3  **ALBRIGHT, STODDARD, WARNICK & ALBRIGHT**
4  801 South Rancho Drive, Suite D-4
   Las Vegas, Nevada 89106
5  Tel: (702) 384-7111
   Fax: (702) 384-0605
6  Email: gma@albrightstoddard.com
7  *Attorneys for Plaintiffs*
   *(additional counsel on signature page)*

8

9                  **UNITED STATES DISTRICT COURT**

10                      **DISTRICT OF NEVADA**

11  Ilona and Lester Thomas Harding, husband          Case No.:  2:17-cv-00248-RFB-VCF
    and wife; individually and on behalf of all
12  others similarly situated,                         **PLAINTIFFS' MEMORANDUM
                                                        OF POINTS AND AUTHORITIES
13          Plaintiffs,                                 IN OPPOSITION TO DIAMOND
                                                        RESORTS COMPANIES'
14                                                      MOTION TO COMPEL
    vs.                                                 ARBITRATION AND TO STAY
15                                                      OR DISMISS THIS ACTION**
16  Diamond Resorts Holdings, LLC; a Nevada
    limited liability company; Diamond Resorts
17  International, Inc., a Delaware corporation;        **ORAL ARGUMENT REQUESTED**
    Diamond Resorts U.S. Collection, L.L.C., a
18  Delaware limited liability company; Diamond
    Resorts International Marketing, Inc., a
19  California corporation; Diamond Resorts
    International Club, Inc., a Florida corporation;
20  Diamond Resorts Management, Inc., an
    Arizona corporation; Diamond Resorts U.S.
21  Collection Members Association, a Delaware
    corporation; Diamond Resorts Developer &
22  Sales Holding Company, a Delaware
    company; Diamond Resorts Financial
23  Services, Inc., a California corporation; and
    Does 1 through 100, Inclusive,
24
25          Defendants.
26

27

28  MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DIAMOND RESORTS
    COMPANIES' MOTION TO COMPEL ARBITRATION AND TO STAY OR DISMISS THE ACTION
    Case No.:  2:17-cv-00248-RFB-VCF

COMES NOW Plaintiffs, ILONA HARDING and LESTER THOMAS HARDING (hereinafter "Plaintiffs" or the "Hardings"), by and through their undersigned counsel of record, and hereby file their Memorandum of Points and Authorities in opposition to "Diamond Resort Companies' Motion to Compel Plaintiffs to Arbitration And to Stay Or Dismiss this Action" ("Motion") [ECF 18] filed by Defendants Diamond Resorts Holdings, Diamond Resorts International, Inc.; Diamond Resorts U.S. Collection [Development], L.L.C; Diamond Resorts International Marketing, Inc.; Diamond Resorts International Club, Inc.; Diamond Resorts Management, Inc.; Diamond Resorts U.S. Collection Members Association; Diamond Resorts Developer & Sales Holding Company; and Diamond Resorts Financial Services, Inc. (collectively, "Diamond" or "Diamond Resort Companies") on April 3, 2017.

## MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DIAMOND RESORTS COMPANIES' MOTION TO COMPEL PLAINTIFFS TO ARBITRATION AND TO STAY OR DISMISS THIS ACTION

### I.    INTRODUCTION

The issue before this Court is whether the Hardings and Diamond have a valid and enforceable agreement to arbitrate. They do not. Because the Hardings properly opted out of the Section 18 Arbitration Provision found in the Purchase and Security Agreement ("PSA"), Diamond cannot now force the Hardings to arbitrate their claims.

Diamond's Motion to Compel Arbitration is nothing but a thinly veiled attempt to rewrite Section 18(a) of the PSA which is entitled Opt-Out Right. Specifically, Diamond claims that the Section18(a) Opt-Out Provision requires a Purchaser to exercise his or her opt-out right within 30 days from the date the Purchaser executed the PSA. But this is untrue. As explained below, the PSA's Opt-Out Provision does not tie the 30-day opt-out window to the date when the PSA was executed. Instead, the 30-day opt-out window is triggered only if or when the Hardings decide that they do not want the Arbitration Provision to apply. That is the way the Arbitration Provision is worded and that is the way it must be interpreted.

Section 18(a) reads as follows:

**IF PURCHASER DOES NOT WANT THIS ARBITRATION PROVISION TO APPLY, WITHIN 30 DAYS PURCHASER MUST SEND A SIGNED LETTER TO SELLER STATING THAT THE ARBITRATION PROVISION DOES NOT APPLY.**

ECF 18-1 at Ex. A, PSA § 18(a). The Hardings properly exercised their right to opt-out of the Arbitration Provision when they sent Diamond their October 11, 2016 letter. As set forth in the Hardings' Declarations,[1] the earliest date that they formed an intent, want or desire to opt-out of the Arbitration Provision was on or after October 1, 2016. As such, the signed demand letter they sent to Diamond was mailed within 30 days of deciding that they did not want the PSA's Arbitration Provision to apply.

Diamond's interpretation of the Opt-Out Provision distorts the contract's actual wording by using a legal sleight-of-hand. Diamond never actually quotes the Opt-Out Provision's exact wording in its brief. *See, generally*, ECF Doc. 18. Instead, Diamond merely attaches the PSA as an exhibit and then incorrectly paraphrases the very Opt-Out Provision that it asks this Court to enforce. Indeed, Diamond's paraphrased version of the Opt-Out Provision adds five new words to the provision: ***"of execution of the agreement."*** ECF Doc. 18, at 5 (emphasis added). As set forth below, the addition of these five words totally changes the meaning of the Section 18(a) Opt-Out Provision. More particularly, Diamond's argument that the 30 day opt-out window is triggered on the date that the Hardings executed the PSA depends on the presence of these five words being part of the Opt-Out Provision. Unfortunately for Diamond, these five words do not appear anywhere in the Opt-Out Provision. Accordingly, Diamond's proposed interpretation of when the 30 day opt-out period is triggered must be ignored. The law requires the Court to interpret the Opt-Out Provision just as Diamond wrote it and not the way Diamond wishes it would read. Otherwise, Diamond's proposed interpretation of the Opt-Out Provision would not

---

[1] Declaration of Ilona Harding in Supprt of Plaintiffs' Opposition to Diamond Resort Companies' Motion to Compel Arbtiration and to Stay or Dismiss the Action, Ex. A, and Declaration of Lester Thomas Harding in Supprt of Plaintiffs' Opposition to Diamond Resort Companies' Motion to Compel Arbtiration and to Stay or Dismiss the Action, Ex. B (collectively, the "Harding Declarations").

2

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DIAMOND RESORTS COMPANIES' MOTION TO COMPEL ARBITRATION AND TO STAY OR DISMISS THE ACTION
Case No.: 2:17-cv-00248-RFB-VCF

1    only be inaccurate, but it also would make a mockery of well-understood grammar and contract

2    rules. As such, Diamond's Motion should be denied.

3         Alternatively, Diamond's Motion should be denied because it still lacks an enforceable

4    agreement to arbitrate with the Hardings for two additional reasons. First, Diamond's proposed

5    interpretation confirms that it omitted essential, material terms. As such, there was no meeting of

6    the minds. Second, the Arbitration Provision is unenforceable because it claims to provide the

7    purchaser with the exclusive right to select the National Arbitration Forum ("NAF") as the

8    arbitrator. But the NAF has not handled consumer arbitrations since 2009. Accordingly, no valid

9    and enforceable agreement to arbitrate exists between the Hardings and Diamond.

10   ## II.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

11        Diamond touts itself as a global leader in the hospitality service industry. ECF 18-1 at Ex.

12   1, ¶ 3. Diamond markets and sells vacation club memberships to consumers in the form of right-

13   to-use timeshare interests, specifically vacation ownership interests ("VOIs"), where consumers

14   purchase and use hotel-like rooms owned or operated by Diamond. Unlike traditional "deeded"

15   timeshares, members purchase points, which function as a "currency" and allow members to use

16   Diamond's services and accommodations, in addition to those offered by affiliated companies.

17   *Id.* at ¶ 3-4. However, as the Hardings' Complaint alleges, reality paints a much different picture.

18   More particularly, Diamond's sales and marketing practices are riddled with fraud and deception

19   that have severely damaged thousands, if not tens of thousands, of Diamond's members.

20        Ilona Harding and Lester Thomas Harding, ages 76 and 74, respectively, purchased VOIs

21   from Diamond. Compl. ¶¶ 99-139. At the time of their initial purchase and each successive

22   upgrade purchase, the Hardings and Diamond entered into PSAs. *Id.* Each PSA included an

23   identically-worded Arbitration Provision, memorialized in Section 18. *See* ECF 18-1 at Exs. A,

24   PSA § 18(a); C, PSA §18(a); D, PSA § 18(a); and E, PSA § 18(a). The Arbitration Provision,

25   itself, contains nine subsections, lettered (a) through (i).

26

27

28
MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DIAMOND RESORTS
COMPANIES' MOTION TO COMPEL ARBITRATION AND TO STAY OR DISMISS THE ACTION
Case No.:  2:17-cv-00248-RFB-VCF

At issue here is Section 18(a), which grants and describes an Opt-Out Right that Purchasers may unilaterally exercise. The PSA provides Purchasers with the following Opt-Out Right:

> 18. **<u>ARBITRATION PROVISION</u>**
>
> (a) <u>Opt-Out Right</u>. **IF PURCHASER DOES NOT WANT THE ARBITRATION PROVISION TO APPLY, WITHIN 30 DAYS PURCHASER MUST SEND A SIGNED LETTER TO SELLER STATING THAT THE ARBITRATION PROVISION DOES NOT APPLY.**

*See* ECF 18-1 at Ex. A, PSA § 18(a). When a Purchaser timely opts-out of the Arbitration Provision, the Purchaser opts-out of Section 18 of the PAS in its entirety, including subsections 18(a) through (i). As such, opting out of the Arbitration Provision also includes matters such as opting out of the class action ban, the ban against private attorney general actions, and the ban against joinder or consolidation of claims found in Section 18(h).

Diamond does not dispute that the Hardings formed an intent to not want the Arbitration Provision to apply beginning on or after October 1, 2016. Diamond also does not dispute that on October 11, 2016, which is within thirty days of the Hardings forming that intent, the Hardings sent a signed letter to Diamond opting-out of each and every Arbitration Provision found in each and every PSA they had executed with Diamond. ECF 18-1 at Ex. B. To eliminate any confusion as to their intent, the Hardings also expressly opted-out of all class action bans, all bans on private attorney general actions, and all bans on claim joinder or consolidation. *Id.* In addition, the Hardings also demanded a settlement from Diamond for monetary damages in their October 11, 2016 letter. *Id.*

The Hardings' October 11, 2016 letter advised Diamond, in relevant part, as follows:

> **OPT-OUT NOTICE**
>
> Please take written notice that Ilona and Thomas Harding do hereby exercise their rights to opt-out of the entire ARBITRATION PROVISION found in paragraph 18 of the Purchase and Security Agreement ("PSA") of the DRI U.S. Collections including without limitation: the ban on class action proceedings and class-wide arbitration, either as a representative, class member or otherwise,

with respect to any claim(s); the ban on private attorney general proceedings in court or in arbitration, with respect to any claim(s); and the ban on claim joinder and/or consolidation with respect to any claim(s). In exercising their opt-out rights, the Hardings do hereby notify DRI that paragraph 18 of the PSAs which is entitled "ARBITRATION PROVISION," does not apply to them. Moreover, this opt-out notice is for each and every DRI U.S. Collection membership that the Hardings are or have ever been a member of . . . .

ECF 18-1 at Ex. B. Diamond did not respond to the Hardings' demand letter and opt-out notice. Also, despite the Hardings' request for Diamond to produce certain documents identified in their demand letter, Diamond failed to do so or explain why it chose to withhold the requested information.

Finally, on January 28, 2017, the Hardings filed suit against Diamond on behalf of themselves and all other similarly situated individuals over the age of 60. ECF No. 1. In their Complaint, the Hardings asserted claims against Diamond for violations of the Nevada Deceptive Trade Practices Act, fraud in the inducement, negligent misrepresentation, and breach of the covenant of good faith and fair dealing. Compl. ¶ 149-81. On February 21, 2017, Diamond asked the Hardings' counsel for a 30-day extension to file a response to the Complaint which the Hardings' counsel promptly granted. On April 3, 2017, in lieu of an Answer to the Complaint, Diamond filed its Motion to Compel Arbitration, ECF No. 18, and a companion Motion to Stay. ECF No. 19.

## III.    LEGAL STANDARD

"When considering a Motion to Compel arbitration, the court applies a standard similar to the summary judgment standard of Fed. R. Civ. P. 56.... [sic] If there is doubt as to whether such an agreement exists, the matter should be resolved through an evidentiary hearing or mini-trial." *Amaya v. Spark Energy Gas, LLC*, Case No. 15-cv-02326, 2016 WL 1410755 at *3 (N.D. Cal. Apr. 11, 2016) (quoting *Garbacz v. A.T. Kearny, Inc.*, No. 05-cv-05404, 2006 WL 870690, at *2 (N.D. Cal. Apr. 4, 2006)). To compel arbitration, a district court must find that (1) the parties entered into an enforceable arbitration agreement; and (2) that their agreement encompasses the

1  present dispute. *See Larson v. D. Westwood*, Case No. 2:15–cv–01372, 2016 WL 5508825, at *1

2  (D. Nev. Sept. 27, 2016) (J. Boulware II, U.S.D.J.) (citing *Nguyen v. Barnes & Noble Inc.*, 763

3  F.3d 1171, 1175 (9th Cir. 2014)) (explaining a district court's role under the Federal Arbitration

4  Act ("FAA")); *see* Nev. Rev. Stat. Ann. § 38.219 (stating that courts must determine an arbitration

5  agreement's existence and whether "a controversy is subject to an agreement to arbitrate"). This

6  is because the "existence of a contract as a whole must be determined by the court prior to ordering

7  arbitration." *Sanford v. MemberWorks, Inc.*, 483 F.3d 956, 962 (9th Cir. 2007). When deciding if

8  an agreement exists, courts look to "state-law principles that govern the formation of

9  contracts." *Nguyen*, 763 F.3d at 1175; *see* 9 U.S.C. § 2 (stating that under FAA, courts may

10  invalidate arbitration agreements through state laws applicable to contracts generally). "[T]he

11  party moving to compel arbitration has the burden to prove, by a preponderance of the evidence,

12  that an agreement to arbitrate exists." *Amaya v. Spark Energy Gas, LLC*, Case No. 15-cv-02326,

13  2016 WL 1410755 at *3 (N.D. Cal. Apr. 11, 2016); *D.R. Horton, Inc. v. Green*, 96 P.3d 1159,

14  1162 (Nev. 2004).

15  **IV.    ARGUMENT**

16        The Hardings timely opted-out of the Arbitration Provision. As such, Diamond's Motion

17  fails at the very first step of the Court's legal inquiry, because a contract to arbitrate does not

18  exist.[2] As further detailed below, given the absence of a valid and enforceable agreement to

19  arbitrate, Diamond's Motion must be denied.

20        **A.    The FAA's Policy Goals Are Irrelevant Because Scope Is Not at Issue**

21        While courts consider the Federal Arbitration Act's policy goals when assessing the *scope*

22  of an arbitration clause, the issue here is not scope, but rather *contract formation*. As the Supreme

23  Court has explained, "[b]ecause the FAA is 'at bottom a policy guaranteeing the enforcement of

24

25  _____

   [2] While the Hardings do not agree with the factual assertions raised in Diamond's argument
26  concerning the purported conscionability of its Arbitration Provision, at this time,
   unconscionability is not in issue. For example, as will be detailed throughout this opposition,
27  Hardings do not agree with Diamond's interpretation of the thirty (30) day window or the
   contention that the Arbitration Provision is "extremely consumer friendly." ECF No.18 at 9.

28

private contractual arrangements,' [ ] we look first to whether the parties agreed to arbitrate a dispute, not to general policy goals . . . ." *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002) (internal citations omitted); *see Gove v. Career Sys. Dev. Corp.*, 689 F.3d 1, 7-8 (1st Cir. 2012) (explaining that when FAA policy is pitted against contract formation policies, the latter controls where contract formation is in issue). Therefore, Diamond's reliance upon the FAA's policy favoring arbitration improperly conflates the issue of contract formation with scope of arbitrability.[3]   More particularly, the issue before this Court is whether the parties have a valid and enforceable agreement to arbitrate, not whether the substantive claims of the Hardings are arbitrable. Therefore, policy considerations relevant to contract formation, like the doctrine of *contra proferentem*, control this dispute, not the pro-arbitration goals of the FAA.

### B. The Hardings Timely Opted-Out of Arbitration

Diamond falsely asserts that an enforceable agreement to arbitrate exists between itself and the Hardings.  Specifically, Diamond claims that the Hardings failed to timely opt-out of the Arbitration Provision. Diamond is wrong. Diamond intentionally misapplies the terms and conditions of the Opt-Out Provision to the facts of the case by wrongfully contending that the Hardings only had 30 days to opt-out of the Arbitration Provision from the date the Hardings executed the PSA. Diamond's interpretation of the PSA is unsupported by the actual wording found in the Opt-Out provision. No valid and enforceable agreement to arbitrate exists here because the Hardings timely exercised their right to opt-out of the PSA's Arbitration Provision.

Under Nevada law, courts must give effect to every word in a contract, "if at all possible." *Bielar v. Washoe Health Sys., Inc.*, 306 P.3d 360, 364 (Nev. 2013) (quoting *Mussser v. Bank of Am.*, 964 P.2d 51, 54 (1998)). When construing a contract, courts give contractual terms their plain and ordinary meaning, and where a contract's language is clear and unambiguous, courts

---

[3] ECF No. 18 at 7. The cases Diamond rely upon go exclusively to the scope of arbitrability. *See, e.g., Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 721 (9th Cir. 1999) ("Any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."); *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983) (stating that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration").

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DIAMOND RESORTS COMPANIES' MOTION TO COMPEL ARBITRATION AND TO STAY OR DISMISS THE ACTION
Case No.: 2:17-cv-00248-RFB-VCF

enforce the contract as written. *Am. First Fed. Credit Union v. Soro*, 359 P.3d 105, 106 (Nev. 2015) (quoting *Davis v. Beling*, 278 P.3d 501, 515 (Nev. 2012)). Rules of grammar and punctuation are relevant in deciding the meanings of words and phrases. *Grange Insurance Association v. Sran*, 184 F. Supp. 3d 799, 814 (E.D. Cal. 2016); *Han v. Synergy Homecare Franchising, LLC*, No. 16-cv-03759, 2017 WL 446881, at *5 (N.D. Cal. Feb. 2, 2017) ("Punctuation, including the use of commas, is significant and affects meaning in written contracts.") (internal citations omitted). Syntax is equally relevant to contract interpretation. For example, in *American Federation of Government Employees, AFL-CIO Local 2152 v. Principi*, 464 F.3d 1049, 1055 (9th Cir. 2006), the Ninth Circuit explained that "[u]nder the doctrine of the last antecedent, qualifying phrases are to be applied to the words or phrase immediately preceding the qualifier and are not to be construed as modifying more remote phrases." *Accord Grange Insurance*, 184 F. Supp. 3d at 814 (stating that the last antecedent rule "applies to the grammar of a sentence in a contract"). In *Dandino, Inc. v. U.S. Department of Transportation.*, 729 F.3d 917, 919 (9th Cir. 2013), the United States Court of Appeals for the Ninth Circuit (the "Ninth Circuit") was tasked with interpreting when the 30-day period began to run in the following statutory clause:

> Any aggrieved person who, after a hearing, is ***adversely affected*** by a final order issued under this section may, ***within 30 days***, petition for review. . . .

*Id.* (emphasis added). Bringing the statute's subtext to the fore, it provides that if an aggrieved person is adversely affected by a final order, within 30 days, that person must petition for review. *See id.* Naturally, the Ninth Circuit noted, "the statutory text begs a question: a petition for review is due 'within 30 days,' but 'within 30 days' of what?" *Id.* Consistent with applicable rules of grammar and the last antecedent rule, the Ninth Circuit determined that the statute's thirty (30) day period begins to run from the date that a person is "adversely affected." *See id.*

The exact same principles of contract construction apply to Diamond's arbitration provision, here. Diamond's Opt-Out provision is known as a conditional sentence. Its first clause—"**IF PURCHASER DOES NOT WANT THIS ARBITRATION PROVISION TO**

---

APPLY"—is dependent, because it expresses a condition and raises a question. The question raised is what should a purchaser do if he does not want the Arbitration Provision to apply. The second half—**"WITHIN 30 DAYS PURCHASER MUST SEND A SIGNED LETTER TO SELLER STATING THAT THE ARBITRATION PROVISION DOES NOT APPLY"**—is the main clause and the qualifying phrase in the sentence. It expresses a consequence and answers the question raised in the dependent clause. More particularly, the answer to the question raised in the dependent clause is that the purchaser has 30 days to send a signed letter to the seller Diamond, informing it that the Arbitration Provision does not apply.

This reasoning and analysis is consistent with the operation of syntax employed through principles of English grammar and the cases cited above. Specifically, the term "within 30 days" is applied directly to the triggering event or condition that precedes it, namely the formation of a Purchaser's intent, want, or desire for the Arbitration Provision to not apply. In other words, unless and until the Hardings decide that they do not want the Arbitration Provision to apply, the 30-day opt-out period never begins to run. Any reading to the contrary would constitute an impermissible attempt to rewrite Diamond's Arbitration Provision.

As set forth in the attached Harding Declarations, the Hardings decided they did not want the Arbitration Provision to apply on or after October 1, 2016, when they read the demand letter prepared by their attorney. Declaration of Ilona Harding and Declaration Lester Thomas Harding, Exs. A-B, at ¶ 7. Then, on October 11, 2016, within 30 days of their decision, the Hardings sent a letter to Diamond stating that they did not want the Arbitration Provision to apply. As such, the Hardings followed the proper protocol set forth in the Opt-Out Provision and timely opted-out of the Arbitration Provision.

In summary, since the Hardings have shown that they timely opted out of Diamond's Arbitration Provision, no valid, enforceable agreement to arbitrate exists between them and Diamond. On this ground alone, Diamond's Motion should be denied.

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DIAMOND RESORTS COMPANIES' MOTION TO COMPEL ARBITRATION AND TO STAY OR DISMISS THE ACTION
Case No.:  2:17-cv-00248-RFB-VCF

### C. Diamond's Argument Constitutes an Impermissible Attempt to Rewrite Its Flawed Arbitration Provision.

As just set forth above, there is no valid and enforceable agreement to arbitrate between the Hardings and Diamond. Regardless, Diamond moves to compel arbitration by attempting to rewrite its own PSA. In particular, Diamond seeks to import five words that are not included in any of its PSAs with the Hardings. The actual opt-out provision states, in pertinent part, as follows:

> **IF PURCHASER DOES NOT WANT THE ARBITRATION PROVISION TO APPLY, WITHIN 30 DAYS PURCHASER MUST SEND A SIGNED LETTER TO SELLER STATING THAT THE ARBITRATION PROVISION DOES NOT APPLY.**

In contrast, Diamond would have the Court incorrectly believe that Section 18(a) reads as follows:

> **IF PURCHASER DOES NOT WANT THE ARBITRATION PROVISION TO APPLY, WITHIN 30 DAYS [*OF EXECUTION OF THE AGREEMENT,*] PURCHASER MUST SEND A SIGNED LETTER TO SELLER STATING THAT THE ARBITRATION PROVISION DOES NOT APPLY.**

*See* ECF No. 18 at 5. But this is not the way that Section 18(a) actually reads. Diamond's sleight-of-hand, which seeks to insert five words that are not in the actual Opt-Out Provision, is nothing more than a desperate ploy to avoid the plain meaning of a clause that it alone drafted. Diamond's efforts to mislead the Court must be in vain, as "[i]t is axiomatic that a court will not rewrite a contract . . . ." *Gartland v. Giesler*, 604 P.2d 1238, 1239 (Nev. 1980).

Responsibility for Diamond's Opt-Out Provision's language rests solely with Diamond, as its PSA is a contract of adhesion. As Nevada's Supreme Court has explained, "An adhesion contract is a standardized contract form offered to consumers on a 'take it or leave it' basis, without affording the consumer a realistic opportunity to bargain." *Kindred v. Second Judicial Dist. Court ex rel. Cty. of Washoe*, 996 P.2d 903, 907 (Nev. 2000) (quoting *Obstetrics and Gynecologists v. Pepper*, 693 P.2d 1259, 1260 (Nev. 1985)).

The undisputed evidence shows that Diamond offers its PSA to consumers on a take it or leave it basis. As set forth in the declarations of the Hardings, the Hardings and Diamond did not

1    have equal bargaining power. The PSAs that the Hardings signed were not negotiated at arms-

2    length. Diamond has always exercised exclusive responsibility for drafting the PSAs, including

3    the Arbitration Provision. Furthermore, Diamond admits that the Opt-Out Provision's language

4    has not changed for years. *See* ECF 18-1 at Exs. A, PSA § 18(a); C, PSA §18(a); D, PSA § 18(a);

5    and E, PSA § 18(a). In fact, Diamond even promulgated an identical opt-out provision in its

6    updated Public Offering Statement, a mandatory document, periodically filed with the Nevada

7    Real Estate Division. *See* Public Offering Statement, Ex. C at 10. Nonetheless, Diamond now

8    insists that this Court should rewrite the material terms of its Opt-Out provision for the exclusive

9    benefit of Diamond and to the unilateral detriment of consumers such as the Hardings. Diamond's

10   attempt to rewrite the terms of the Opt-Out Provision must not be allowed by the Court. Moreover,

11   Diamond's interpretation of the PSA is telling, because it confirms that no valid and enforceable

12   arbitration agreement exists. More specifically, Diamond has to import the words "of execution

13   of agreement" in order to justify the trigger date it has proposed. But those very words are

14   nowhere to be found in the Opt-Out Provision. Since those words are missing from the Opt-Out

15   Provision, the only conclusion that can be reached is that essential and material terms in the Opt-

16   Out Provision are lacking and that no meeting of the minds occurred on the trigger date. Based

17   on the foregoing, Diamond's Motion to Compel Arbitration should be denied.

18
19   **D. Because Any Ambiguity in the Opt-Out Provision Resulted from Diamond's Own
         Drafting, It Should Not Be Interpreted in Diamond's Favor**

20        No language in the Opt-Out Provision refers to "of execution of the agreement" as the

21   trigger for the opt-out period. Instead, Diamond's argument, at best, supports a finding that the

22   meaning of the Opt-Out Provision is inherently ambiguous. But, as explained below, such a

23   finding will not help Diamond because ambiguities are construed against the drafter—Diamond—

24   and in favor of the Hardings.

25        A contract is ambiguous where it is susceptible to more than one reasonable interpretation.

26   *Doe v. Light Group, LLC*, No. 2:13–cv–2323, 2014 WL 1764794, at *1 (D. Nev. May 1, 2014)

27   (citing *Anvui, LLC v. G.L. Dragon, LLC*, 163 P.3d 405, 406-07 (Nev. 2007) (adopting the non-

28

drafter's interpretation and finding arbitration clause unenforceable where subject to unilateral modification by company party)). Where a contract is ambiguous, courts follow the doctrine of *contra proferentem* and construe the ambiguous provision or term against the drafter.[4] Since this presumption constitutes a general principle of contract construction, it equally applies to the construction of arbitration agreements.[5] Thus, to the extent Diamond "drafted an ambiguous document, [Diamond] cannot now claim the benefit of the doubt." *Mastrobuono*, 514 U.S. at 63 (interpreting choice-of-law provision in an arbitration agreement against the drafting party). The *contra proferentem* rule exists "to protect the party who did not choose the language from an unintended or unfair result." *Id.* By applying these principles, the Hardings, at a bare minimum, have advanced a reasonable interpretation of the Opt-Out Provision. Therefore, as the non-drafting party, any ambiguity properly resolves in the Hardings' favor.

The parties' conduct further confirms the Hardings' interpretation. When interpreting an ambiguous contract, Nevada's courts "examine the circumstances surrounding the parties' agreement [to determine their intentions, which] includes . . . *subsequent acts and declarations of the parties.*" *Shelton v. Shelton*, 78 P.3d 507, 510 (Nev. 2003) (emphasis added) (internal quotation marks and citations omitted). On October 11, 2016, the Hardings sent a signed letter to Diamond Resorts U.S. Collection, LLC, informing Diamond of their intent to opt-out of the Arbitration Provision. Diamond admits receiving this letter because it is attached to its Exhibit 1. Rather than objecting to the Hardings' interpretation out-of-hand, Diamond only now, after the

---

[4] *Coker Equipment Co., Inc. v. Wittig*, Nos. 08-16359, 08-16362, 2010 WL 547532, at *1 (9th Cir. Feb. 26, 2010); *Moroni Corp. Investments Intern., Inc. v. Edgemon*, No. 57407, 2012 WL 5378151, at *3 (Nev. Oct. 31, 2012); *Dickenson v. State, Dept. of Wildlife*, 877 P.2d 1059,1061 (Nev. 1994); *Am. Fire & Safety, Inc. v. City of North Las Vegas*, 849 P.2d 352, 363 (Nev. 1993); *see also Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62-63 (1995) (explaining that a "court should construe ambiguous language against the interest of the party that drafted it").

[5] *See* 9 U.S.C. § 2 (providing that purported arbitration agreements may be overturned "upon such grounds as exist at law or in equity for the revocation of any contract); *DIRECTV, Inc. v. Imburgia*, 136 S. Ct. 463, 470-71 (2015) (recognizing canon of construction but finding no ambiguity in choice-of-law provision); *Cardiovascular Biotherapeutics, Inc. v. Jacobs*, No. 2:14–cv-1965, 2015 WL 713181, at *5 (D. Nev. Feb. 19, 2015); *Ward v. Goossen*, 71 F. Supp. 3d 1010, 1016-18 (N.D. Cal. 2014) (interpreting forum selection clause against drafting party, leading the court to reject a Motion to Compel arbitration); *Mulcahy v. Nabors Well Services Co.*, No. 10–cv–21, 2010 WL 1881846, at *2 (D. Mon. May 7, 2010).

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DIAMOND RESORTS COMPANIES' MOTION TO COMPEL ARBITRATION AND TO STAY OR DISMISS THE ACTION
Case No.: 2:17-cv-00248-RFB-VCF

passage of a full nine months and the filing of a putative class action, challenges the Hardings'

interpretation of the Opt-Out Provision. In tandem, their conduct shows that the Hardings'

position is genuine, and that Diamond found it to be reasonable.

Even if the Court were willing to entertain Diamond's proposed interpretation of the Opt-

Out Provision, there is no basis to adopt Diamond's interpretation over other equally plausible

interpretations. For example, the Court could easily import the words "within 30 days of filing

suit" or "within 30 days from a demand for arbitration" as alternative triggers for the Opt-Out

period. Beyond the Court's obligation to interpret any perceived ambiguity in the Arbitration

Provision in favor of the non-drafter, it would be entirely arbitrary and capricious for the Court

to select one reasonable interpretation over another. In fact, the only limitation on the number of

reasonable interpretations that the Court could find is the imagination and creativity of the human

mind. Regardless, not only have the Hardings offered a reasonable interpretation for the 30 day

opt-out trigger, but the Hardings have actually offered the grammatically correct interpretation.

As such, the Hardings timely opted-out of the Arbitration Provision.

For the many reasons set forth herein, the Hardings have demonstrated that there is no

valid and enforceable agreement to arbitrate. More particularly, the Hardings followed the proper

protocol mandated by the Section 18(a) Opt-Out Provision. As a result, the Hardings timely opted

out of the Arbitration Provision and Diamond's Motion should be denied.

### E.  In the Alternative, Incurable Vagueness and Forum Unavailability Render the Entire Arbitration Provision Unenforceable

Arguing in the alternative, and only if the Court is unwilling to adopt the Hardings'

interpretation of the Section 18(a) Opt-Out Right, the Arbitration Provision is still unenforceable

for at least two additional reasons. First, Diamond's proposed interpretation confirms that it

omitted essential, material terms, which thereby render the Opt-Out provision unenforceable.

Second, since the National Arbitration Forum ("NAF") has not handled consumer arbitrations

since 2009, the NAF's unavailability vitiates integral aspects of the Arbitration Provision.

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DIAMOND RESORTS
COMPANIES' MOTION TO COMPEL ARBITRATION AND TO STAY OR DISMISS THE ACTION
Case No.:  2:17-cv-00248-RFB-VCF

1    Accordingly, no valid and enforceable agreement to arbitrate exists between the Hardings and

2    Diamond.

3        *1.   The Opt-Out Clause Is Insufficiently Specific to Enforce*

4            No valid and enforceable arbitration agreement exists between the Hardings and Diamond

5    because the parties' minds never met as to certain material and essential terms that Diamond now

6    attempts to inject into the Opt-Out Provision. Under Nevada law, a contract's material terms must

7    be sufficiently definite for a court to determine what the contract requires of the parties. *Grisham*

8    *v. Grisham*, 289 P.3d 230, 235 (Nev. 2012) (citing *May v. Anderson*, 119 P.3d 1254, 1257 (Nev.

9    2005)). In other words, "'[a] valid contract cannot exist when material terms are lacking or are

10   insufficiently certain and definite' for a court 'to ascertain what is required of the respective

11   parties' and to 'compel compliance' if necessary." *Id.* In *Certified Fire Prot. Inc. v. Precision*

12   *Construction, Inc.,* 283 P.3d 250, 255 (Nev. 2012), Nevada's Supreme Court held "[a] meeting

13   of the minds exists when the parties have agreed upon the contract's essential terms," and the

14   Court ruled that the time for performance constitutes an essential term. Courts regularly invalidate

15   arbitration agreements through this principle's application.[6] Indeed, many courts also stress the

16   importance of clearly describing arbitration opt-out procedures. *Smith v. Xlibris Publ'g*, No. 15-

17   cv-5334,2016 WL 5678566, at *4 (E.D. N.Y. Sept. 30, 2016) (noting that a proper opt-out

18   provision "unambiguously stated [its] procedure"); *Hawthorne v. Bj's Wholesale Club*, Civil

19   Action No. 3:15-cv-572, 2016 WL 4500867, at *6 (E.D. Va. Aug. 26, 2016) (stating how an

20   appropriate agreement "clearly and unambiguously stated that . . . [Plaintiff] could opt out");

21   *Varon v. Uber Technologies, Inc.*, No.-15-cv-3650, 2016 WL 1752835, at *4 (D. Md. May 3,

22   2016) (mentioning how an opt-out provision was "clearly stated").

---

23   [6] *See Roth v. Scott*, 921 P.2d 1262, 1265 (Nev. 1996) (explaining that where "parties d[o] not have
24   a meeting of the minds as to the essential terms of the contract, there [is] no agreement for binding
     arbitration . . ."); *Lima v. Gateway, Inc.*, 886 F. Supp. 2d 1170, 1186 (C.D. Cal. 2012) (striking
25   an alternative arbitral forum clause, after finding the court could not provide additional terms, and
     thus rendering the agreement unconscionable); *Casteel v. Clear Channel Broad., Inc.*, 254 F.
26   Supp. 2d 1081, 1089 (W.D. Ark. 2003) (invalidating a video-taped overview of an arbitration
     policy, since it lacked "reasonabl[y] certain[ ]" terms and provided no "basis for determining the
27   existence of a breach . . ."). *See also C.H.I. Inc. v. Marcus Bros. Textile, Inc.*, 930 F.2d 762, 764
     (9th Cir. 1991) (upholding an arbitration agreement only after finding it sufficiently specific).

28   MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DIAMOND RESORTS
     COMPANIES' MOTION TO COMPEL ARBITRATION AND TO STAY OR DISMISS THE ACTION
     Case No.: 2:17-cv-00248-RFB-VCF

1    The Hardings never agreed that the Opt-Out Provision required them to send a letter to

2  Diamond opting-out of the Arbitration Provision within 30 days from when they executed the

3  PSA. As set forth above, Diamond's five words—"of execution of the agreement"—have never

4  existed in the PSA. Diamond is trying to inject those words into the PSA in a feeble attempt to

5  avoid a class action lawsuit. Moreover, Diamond is injecting those words after the Hardings

6  executed the PSA and initiated this action, after the Hardings executed the PSA and initiated this

7  action.

8    Diamond is well aware of the essential and material nature of these new terms. Allowing

9  those five words to be incorporated into the Opt-Out Provision now would totally change the

10  meaning of the Hardings' opt-out rights.  Absent those five new words, the Opt-Out Provision

11  cannot be given the meaning Diamond so desperately wants it to have, i.e. the Hardings had 30

12  days to opt out of the Arbitration Provision beginning on the date that they signed the PSA.

13  Accordingly, the Hardings object to any attempt by Diamond to rewrite its contract. Diamond

14  should not be allowed to welch on a deal it already made.

15    Closer examination of the PSA shows that Diamond is perfectly capable of drafting a

16  contractual provision that ties the time for performance of a provision, such as the cancellation of

17  the contract, to the contract's execution date. For example, Section 21 of the Hardings' most

18  recent PSA gives the Hardings the right to cancel or rescind their contract. Specifically, Diamond

19  memorialized that essential and material term by providing "The purchaser of a timeshare may

20  cancel, by written notice, the contract of sale until midnight of the fifth calendar day following

21  the date of execution of the contract . . . ." ECF 18-1 at Ex. A, PSA, § 21. The fact that Diamond

22  expressly tied the five day right of cancellation to the date of execution in Paragraph or Section

23  21 demonstrates the material and essential nature of the missing term "of execution of the

24  agreement" in the Opt-Out Provision. Absent those five words, the Hardings could not possibly

25  be expected to divine Diamond's grammatically incorrect interpretation that the 30-day window

26  to opt-out of the Arbitration Provision was triggered on the date when the Hardings executed the

27  PSA. Omitting those five words from the Opt-Out Provision (thereby reading the Opt-Out

28

Provision as actually worded) creates a situation where the parties never had a meeting of the minds on essential and material terms of the contract. Accordingly, pleading in the alternative, the Court must find that in the absence of those five words, no valid and enforceable agreement to arbitrate was ever formed between the Hardings and Diamond.

Reference to enforceable opt-out clauses in other cases reinforces the essential and material nature of the terms that Diamond now proposes to insert. For example, the following enforceable arbitration provision that includes a trigger date provides as follows:

> If you do not wish to accept this binding Arbitration Provision, you must notify us in writing within 30 days after the date indicated on your first billing statement after receipt of this Agreement stating your non-acceptance.

*Zarandi v. Alliance Data Systems Corp.*, No. 10–cv-8309, 2011 WL 1827228, at *1 (C.D. Cal. May 9, 2011).[7] Unlike the precise language used in *Zarandi* where the consumer clearly had 30 days to opt out of arbitration beginning on the date indicated on the first billing statement, here, the triggering event or condition that Diamond seeks to enforce simply does not exist in its Opt-Out Provision. In other words, the glaring absence of the five words "of execution of the agreement," confirms that no meeting of the minds could have ever occurred between the Hardings and Diamond. As such, if the Court is unwilling to adopt the Hardings' interpretation of the Opt-Out Provision, in the alternative, the Opt-Out Provision lacks sufficient specificity to constitute a valid and enforceable agreement to arbitrate. After all, if the Hardings' interpretation

---

[7] *See also Stern v. HRB Digital, LLC*, No. 13-cv-00175, 2013 WL 12145014, at *1 (W.D. Mo. Aug. 12, 2013) ("**You may opt-out (reject) arbitration within the first 30 days after you License the Software . . . .**"); *Curtis v. Contract Mgmt. Services*, No. 1:15-cv-487, 2016 WL 5477568, at *2 (D.Me. Sept. 29, 2016) ("In order to be effective, the writing must clearly indicate my intent to opt out of this Arbitration Provision and the envelope containing the signed writing **must be post-marked within 30 days** of the date I sign this Subscription."); *Fischer v. Kmart Corp.*, No. 13-cv-4116, 2014 WL 3817368, at *2 (D. N.J. Aug. 4, 2014) (" I also understand that I may change my mind and opt out of the Agreement within 30 days of today's date by returning the Arbitration Policy/Agreement Opt Out form at the end of the Agreement."); *Jose Sierra v. Oakley Sales Corp.*, No. 13-cv-0319,2013 WL 12149237, at *1 (C.D. Cal. Apr. 25, 2013) ("[Y]ou may opt-out by notifying us in writing (on the form provided and called the Opt-Out of Dispute Resolution Agreement) within 30 days of receipt of this Agreement . . .").

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DIAMOND RESORTS COMPANIES' MOTION TO COMPEL ARBITRATION AND TO STAY OR DISMISS THE ACTION
Case No.: 2:17-cv-00248-RFB-VCF

is not viable, there is absolutely no way that Diamond's proposed interpretation is the only correct one.

Based on the foregoing, Diamond's Motion should be denied on the alternative ground that no meeting of the minds occurred as to material, essential terms. Therefore, there is no valid and enforceable agreement to arbitrate between the Hardings and Diamond.

### 2. *The Opt-Out Clause Is Essential to the Arbitration Agreement and Therefore Should Not Be Severed*

To the extent that the Opt-Out Provision is deemed unenforceable, the entire Arbitration Provision fails as a result of its non-severability. If a contractual provision is unenforceable, courts only enforce the remaining contract if the provision stricken "is not an essential part of the agreed exchange." Restatement (Second) of Contracts § 184(1) (1981); *Dredge Corp. v. Wells Cargo*, 410 P.2d 751, 754 (1966) (relying on the Restatement's severability provisions.). Severability clauses do not allow courts to sever essential provisions. *See Inetianbor v. CashCall, Inc.*, 768 F.3d 1346, 1353 (11th Cir. 2014).

Notwithstanding the PSA's severability clause, the Opt-Out Provision is not susceptible to severance because it is essential to and pervades the Arbitration Provision. First, the Opt-Out Provision cannot be severed from the remainder of the Arbitration Provision because it constitutes an essential term. A contract's repeated reference to one provision demonstrates that the provision is essential. For example, in *National Iranian Oil Co. v. Ashland Oil, Inc.*, 817 F.2d 326, 334 (5th Cir. 1987), the Court of Appeals for the Fifth Circuit declined to sever and strike a forum selection clause in an arbitration provision where the Court held that "the situs selection clause was as important to [Plaintiff] as the agreement to resolve disputes privately through arbitration." Second, severability clauses do not allow courts to sever essential provisions, which "pervade[ ] the entire arbitration agreement, including the paragraph labeled 'Agreement to Arbitrate.'" For example, in *Inetianbor v. CashCall, Inc.*, 768 F.3d 1346, 1352-53 (11th Cir. 2014), the Court of Appeals for the Eleventh Circuit affirmed the trial court's denial of a Motion to Compel where

the agreed upon arbitral forum was no longer available, notwithstanding the arbitration provision's severability clause.

Like the forum provisions in *National Iranian Oil Co.* and *Inetianbor*, the Opt-Out Provision pervades and is essential to the Arbitration Provision. Not only is it the first clause in the Arbitration Provision, but it is also written in bold and all capital letters. Indeed, other provisions in the Arbitration Provision are inherently intertwined with the application of the Opt-Out Provision. For example, Section 18(c) of the PSA, entitled "Arbitration of Claims," states that "[u]nless Purchaser has exercised his or her opt-out right pursuant to Section 18(a) . . . any claim between Purchaser and Diamond shall be resolved by binding individual (and not class) arbitration." Thus, just as in *Inetianbor*, this agreement is distinct from others that "clearly evidence[ ] an intent to arbitrate no matter what." Moreover, courts increasingly view opt-out clauses as essential provisions, finding them important factors in unconscionability analyses.[8] The Hardings should be entitled to rely on the Opt-Out Provision as a proper way to avoid to the forced arbitration of their claims and the loss of their ability to file a class action, or the elimination of their constitutional right to a jury trial. Therefore, to the extent that the Court is unwilling to adopt the Hardings' interpretation of the Opt-Out Provision, but nonetheless finds the Opt-Out Provision unenforceable, its essentiality renders it non-severable from the remainder of the Arbitration Provision, and Diamond's Motion should be denied.

3. *The Arbitration Provision Is Unenforceable Due to the National Arbitration Forum's Unavailability*

No agreement to arbitrate exists because the designated arbitral forum is integral to the Arbitration Provision. Courts may not enforce arbitration provisions where the parties have selected an unavailable forum that is "integral" to their agreement. *Reddam v. KPMG LLP*, 457 F.3d 1054, 1060 (9th Cir. 2006), *abrogated on other grounds by Atlantic Nat. Trust LLC v. Mt.*

---

[8] *See Smith v. Xlibris Publ'g*, No. 15-cv-5334, 2016 WL 5678566, at *4 (E.D. N.Y. Sept. 30, 2016); *Hawthorne v. BJ's Wholesale Club*, No. 3:15-cv-572, 2016 WL 4500867, at *6 (E.D. Va. Aug. 26, 2016); *Varon v. Uber Technologies, Inc.*, No. 15-cv-3650, 2016 WL 1752835, at *4 (D. Md. May 3, 2016).

1  *Hawley Ins. Co.*, 621 F.3d 931 (9th Cir. 2010). "[W]hen parties elect for an arbitral proceeding

2  'administered by' a named forum, [as opposed to 'in accordance with' its rules,] that forum should

3  be viewed as integral to the arbitration agreement, absent other evidence to the contrary." Martin

4  Domke, Gabriel Wilner & Larry E. Edmonson, *Domke on Commercial Arbitration* § 18:13 (Aug.

5  2016 Update) (citing *Dean v. Heritage Healthcare of Ridgeway, LLC*, 759 S.E.2d 727 (S.C.

6  2014); *Grant v. Magnolia Manor–Greenwood, Inc.*, 678 S.E.2d 435, 439 (S.C. 2009); *Carideo v.*

7  *Dell, Inc.*, No. 06–cv–1772, 2009 WL 3485933, at *4 (W.D. Wash. Oct. 26, 2009); *Carr v.*

8  *Gateway, Inc.*, 918 N.E.2d 598, 602-03 (Ill. App. Ct. 2009); *Covenant Health & Rehab. of*

9  *Picayune, L.P. v. Estate of Moulds ex rel. Braddock*, 14 So.3d 695 (Miss. 2009)).

10     Here, the arbitral forum clause is integral to the Arbitration Provision because the arbitral

11  forum provision purports to vest Purchasers with an *exclusive* right of election. That is, the PSA

12  purports to allow the Purchaser to unilaterally designate the NAF as the sole and exclusive arbitral

13  forum within twenty days after a demand for arbitration. ECF 18-1 at Ex. A, PSA § 18(b); *see*

14  *also* ECF No. 18 at 5 (forum designated "***at the Purchaser's election***") (emphasis added). The

15  mere fact that the Purchaser possesses a unilateral election right demonstrates that the parties did

16  not view their arbitral forum as an "ancillary" concern. Many, if not most, arbitration agreements

17  do not confer upon one party a unilateral right to elect an arbitral forum. Repeated reference to

18  "Administrator," which becomes synonymous with the NAF upon Purchaser's election, reaffirms

19  the integral nature of the arbitral forum.

20     However, what purports to be an exclusive right of election actually constitutes nothing

21  more than an illusory promise, because, pursuant to a settlement agreement with the Minnesota

22  Attorney General, the NAF voluntarily ceased to administer consumer arbitration disputes as of

23  July 24, 2009. Ex. D at ¶ 1-3. Consequentially, Diamond was never in a position to confer upon

24  Purchasers an exclusive right of arbitral forum election, at least not with respect to the NAF.

25  Given that this voluntary cessation took place years earlier, Diamond knew or should have known

26  that this exclusive right of election was hollow as it was never available to confer upon a purchaser

27  in the first place. Curiously, Diamond continues to tout this right of election to the NAF as a basis

28

1  for its "consumer-friendly" Arbitration Provision in their moving papers. ECF No. 18, at 5.

2  Ultimately, the NAF cannot be severed from this Arbitration Provision without expressly

3  divesting the Purchaser of the exclusive right of election upon which the arbitral forum clause is

4  premised. Therefore, the exclusive right of forum election is integral to their agreement, and since

5  the NAF is unavailable, no enforceable agreement to arbitrate exists. On this ground, Diamond's

6  Motion should be denied.

7  **V.    CONCLUSION**

8       The Hardings timely opted out of Diamond's Arbitration Provision, and have acted in

9  accordance with their grammatically correct, reasonable interpretation of when the 30 day Opt-

10 Out period is triggered. While principles of contract law demand an interpretation of the Opt-Out

11 Provision in accordance with its plain words and meaning, any perceived ambiguity still inures

12 to the benefit of purchasers. Moreover, Diamond's improper attempt to import words into the

13 Opt-Out Provision that otherwise do not exist is contrary to law. In the alternative, even if the

14 Court is unwilling to adopt the Hardings' interpretation, the Arbitration Provision is still

15 unenforceable because of the absence of essential terms in the Opt-Out Provision and arbitral

16 forum unavailability premised upon an exclusive right of election. For these and all of the other

17 reasons offered by the Hardings in their Response, Diamond's Motion to Compel should be

18 denied.

19       DATED this 17th day of April, 2017.

20                                    ALBRIGHT, STODDARD, WARNICK &
                                      ALBRIGHT

21

22                                    G. MARK ALBRIGHT, ESQ.
                                      Nevada Bar No. 1394
23                                    CHRIS ALBRIGHT, ESQ.
                                      Nevada Bar No. 4904
24                                    ALBRIGHT, STODDARD, WARNICK &
                                      ALBRIGHT
25                                    801 South Rancho Drive, Suite D-4
                                      Las Vegas, Nevada 89106
26                                    Tel:    (702) 384-7111
                                      Fax:    (702) 384-0605
27                                    Email:  gma@albrightstoddard.com

28
MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DIAMOND RESORTS
COMPANIES' MOTION TO COMPEL ARBITRATION AND TO STAY OR DISMISS THE ACTION
Case No.: 2:17-cv-00248-RFB-VCF

KATHRYN HONECKER, ESQ.*
AUDRA E. PETROLLE, ESQ.*
**ROSE LAW GROUP, PC**
7144 Stetson Drive, Suite 300
Scottsdale, Arizona 85251
Tel:      (480) 505-3939
Fax:      (480) 505-3925
Email: khonecker@roselawgroup.com
apetrolle@roselawgroup.com

ROBERT C. TARICS, ESQ.*
**THE TARICS LAW FIRM, P.C.**
9810 East Thompson Peak Parkway, Unit 811
Scottsdale, Arizona  85255
Tel:      (480) 686-9390
Fax:      (713) 682-9911
Email: rtarics@taricslaw.com

AMBER L. ECK, ESQ.**
**ZELDES HAEGGQUIST & ECK, LLP**
225 Broadway, Suite 2050
San Diego, California  92101
Tel:      (619) 342-8000
Fax:      (619) 342-7878
Email: ambere@zhlaw.com

*admitted pro hac vice
**pro hac vice pending

Attorneys for Plaintiffs

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DIAMOND RESORTS COMPANIES' MOTION TO COMPEL ARBITRATION AND TO STAY OR DISMISS THE ACTION
Case No.:  2:17-cv-00248-RFB-VCF

1

## CERTIFICATE OF SERVICE

2       I hereby certify that on the ___17___ day of April, 2017, service of a true and correct copy

3  of the foregoing **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN**

4  **OPPOSITION TO DIAMOND RESORTS COMPANIES' MOTION TO COMPEL**

5  **ARBITRATION AND TO STAY OR DISMISS THIS ACTION** was made via the United

6  States District Court's CM/ECF electronic filing system addressed to all parties on the e-

7
service list.

8

9                                        _____

10                                        An employee of Albright, Stoddard,
                                          Warnick & Albright

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DIAMOND RESORTS
COMPANIES' MOTION TO COMPEL ARBITRATION AND TO STAY OR DISMISS THE ACTION
Case No.: 2:17-cv-00248-RFB-VCF

## Index of Exhibits

| EXHIBIT | DOCUMENT |
|---|---|
| A | Declaration of Ilona Harding in Support of Plaintiffs' Opposition to Diamond Resorts Companies' Motion to Compel Plaintiffs to Arbitration and to Stay or Dismiss This Action |
| B | Declaration of Lester Thomas Harding in Support of Plaintiffs' Opposition to Diamond Resorts Companies' Motion to Compel Plaintiffs to Arbitration and to Stay or Dismiss This Action |
| C | The Public Offering Statement of Diamond Resorts U.S. Collection, Effective August 1, 2015 |
| D | State of Minnesota, Office of the Attorney General, *National Arbitration Forum Barred from Credit Card and Consumer Arbitrations Under Agreement with Attorney General Swanson* (2009) |

**EXHIBIT "A"**

1  G. MARK ALBRIGHT, ESQ.                    **Electronically Filed April 17, 2017**
   Nevada Bar No. 1394
2  CHRIS ALBRIGHT, ESQ.
   Nevada Bar No. 4904
3  **ALBRIGHT, STODDARD, WARNICK & ALBRIGHT**
   801 South Rancho Drive, Suite D-4
4  Las Vegas, Nevada 89106
   Tel: (702) 384-7111
5  Fax: (702) 384-0605
   Email: gma@albrightstoddard.com
6

7  *Attorneys for Plaintiffs*

8  *(additional counsel on signature page)*

9

10                **UNITED STATES DISTRICT COURT**

11                    **DISTRICT OF NEVADA**

12  Ilona Harding, an individual; Lester Thomas      Case No.: 2:17-cv-00248-RFB-VCF
    Harding, an individual, all on behalf of
13  themselves and all similarly-situated            **DECLARATION OF ILONA**
    individuals,                                     **HARDING IN SUPPORT OF**
14                                                   **PLAINTIFFS' OPPOSITION TO**
                                                     **DIAMOND RESORTS COMPANIES'**
15          Plaintiffs,                              **MOTION TO COMPEL**
                                                     **PLAINTIFFS TO ARBITRATION**
16          vs.                                      **AND TO STAY OR DISMISS THIS**
                                                     **ACTION**
17  Diamond Resorts Holdings, LLC; a Nevada
18  limited liability company; Diamond Resorts
    International, Inc., a Delaware corporation;
19  Diamond Resorts U.S. Collection, L.L.C., a
    Delaware limited liability company; Diamond
20  Resorts International Marketing, Inc., a
    California corporation; Diamond Resorts
21  International Club, Inc., a Florida corporation;
    Diamond Resorts Management, Inc., an
22  Arizona corporation; Diamond Resorts U.S.
    Collection Members Association, a Delaware
23  corporation; Diamond Resorts Developer &
    Sales Holding Company, a Delaware
24  company; Diamond Resorts Financial
    Services, Inc., a California corporation; and
25  Does 1 through 100, Inclusive,
26

27          Defendants.

28                                          1
    DECLARATION OF ILONA HARDING IN OPPOSITION TO DIAMOND RESORTS COMPANIES' MOTION TO
    COMPEL ARBITRATION
    Case No.: 2:17-cv-00248-RFB-VCF

**DECLARATION OF ILONA HARDING**

I, Ilona Harding, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.  My name is Ilona Harding. I am 76 years old and legally competent to execute this Declaration.

2.  I am the named plaintiff in the above-captioned case, and make this Declaration in support of Plaintiffs' Opposition to Diamond Resorts Companies' Motion to Compel Plaintiffs to Arbitration and To Stay or Dismiss this Action.

3.  My husband, Lester Thomas Harding, and I entered into a series of Purchase and Security Agreements ("PSAs") with Diamond Resorts U.S. Collection Development, L.L.C ("Diamond").

4.  At no time during any of the sales processes with Diamond did we have any power or authority to negotiate the terms and conditions of the PSAs that Diamond had us sign.

5.  The PSAs were presented to us on pre-printed forms and on a take it or leave it basis.

6.  I am not a lawyer nor do I have any formal legal training.

7.  Prior to the filing of my lawsuit, I instructed my attorney, Robert C. Tarics, to send a demand letter to Diamond. Mr. Tarics mailed the signed demand letter to Diamond on October 11, 2016. I read the proposed demand letter from Mr. Tarics on or after October 1, 2016. As such, I first formed an intent, want or desire for the Arbitration Provision found in Section 18 of the Diamond PSA to **NOT** apply on or after October 1, 2016. I have continued to want the Arbitration Provision **NOT** to apply ever since that date.

8.  In the October 11, 2016 demand letter to Diamond, I notified Diamond that I was exercising my rights to opt-out of any and all Arbitration Provisions or agreements contained in any of the PSAs that I had signed with Diamond.

DECLARATION OF ILONA HARDING IN OPPOSITION TO DIAMOND RESORTS COMPANIES' MOTION TO COMPEL ARBITRATION
Case No.: 2:17-cv-00248-RFB-VCF

9.   When I exercised my opt-out rights from the Arbitration Provisions found in the Diamond PSAs, I expressly notified Diamond that I did not want the Arbitration Provision to apply to me. I also notified Diamond that I was opting out of the class action ban, the ban against aggregating claims, and the ban against private attorney general actions.

10. A true and correct copy of the October 11, 2016 demand letter to Diamond is attached hereto as Exhibit A and incorporated by reference for all purposes.

11. The demand letter expressed my intent to notify Diamond of my decision to opt-out of arbitration not only on my behalf, but also on behalf of all other putative class members. My notice of intent to opt-out of the Diamond Arbitration Provisions found in Section 18 of the PSAs, as well as any other arbitration agreements contained in any contract I may have signed with Diamond, was sent to Diamond less than 30 days from the date when I first formed an intent I did not want the Arbitration Provisions to apply.

12. Based on the foregoing, I timely exercised my rights to opt out of the Diamond Arbitration Provisions, not only for myself, but also on behalf of all of other putative class members in my lawsuit against the Diamond Defendants.

13. It is my desire to have my case decided by a jury trial as guaranteed by the Seventh Amendment to the United States Constitution and any other applicable state or federal laws. I do not want to have any of my claims against any of the Defendants determined or decided through arbitration.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DECLARATION OF ILONA HARDING IN OPPOSITION TO DIAMOND RESORTS COMPANIES' MOTION TO COMPEL ARBITRATION
Case No.: 2:17-cv-00248-RFB-VCF

1

Executed this 17th day of April 2017, in ___Phoenix___, Arizona.

2

_____
ILONA HARDING

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

DECLARATION OF ILONA HARDING IN OPPOSITION TO DIAMOND RESORTS COMPANIES' MOTION TO COMPEL ARBITRATION
Case No.: 2:17-cv-00248-RFB-VCF

EXHIBIT "B"

1   G. MARK ALBRIGHT, ESQ.                          **Electronically Filed April 17, 2017**
    Nevada Bar No. 1394
2   CHRIS ALBRIGHT, ESQ.
    Nevada Bar No. 4904
3   **ALBRIGHT, STODDARD, WARNICK & ALBRIGHT**
    801 South Rancho Drive, Suite D-4
4   Las Vegas, Nevada 89106
    Tel: (702) 384-7111
5   Fax: (702) 384-0605
    Email: gma@albrightstoddard.com
6
7   *Attorneys for Plaintiffs*
8   *(additional counsel on signature page)*
9
10                  **UNITED STATES DISTRICT COURT**
11                       **DISTRICT OF NEVADA**

12  Ilona Harding, an individual; Lester Thomas      Case No.: 2:17-cv-00248-RFB-VCF
    Harding, an individual, all on behalf of
13  themselves and all similarly-situated            **DECLARATION OF LESTER**
14  individuals,                                     **THOMAS HARDING IN SUPPORT**
                                                     **OF PLAINTIFFS' OPPOSITION TO**
15         Plaintiffs,                               **DIAMOND RESORTS COMPANIES'**
                                                     **MOTION TO COMPEL**
16         vs.                                       **PLAINTIFFS TO ARBITRATION**
                                                     **AND TO STAY OR DISMISS THIS**
17  Diamond Resorts Holdings, LLC; a Nevada          **ACTION**
18  limited liability company; Diamond Resorts
    International, Inc., a Delaware corporation;
19  Diamond Resorts U.S. Collection, L.L.C., a
    Delaware limited liability company; Diamond
20  Resorts International Marketing, Inc., a
    California corporation; Diamond Resorts
21  International Club, Inc., a Florida corporation;
    Diamond Resorts Management, Inc., an
22  Arizona corporation; Diamond Resorts U.S.
    Collection Members Association, a Delaware
23  corporation; Diamond Resorts Developer &
    Sales Holding Company, a Delaware
24  company; Diamond Resorts Financial
    Services, Inc., a California corporation; and
25  Does 1 through 100, Inclusive,
26
27         Defendants.
                                          1
28  _____
    DECLARATION OF LESTER THOMAS HARDING IN OPPOSITION TO DIAMOND RESORTS COMPANIES' MOTION
    TO COMPEL ARBITRATION
    Case No.: 2:17-cv-00248-RFB-VCF

## DECLARATION OF LESTER THOMAS HARDING

I, Lester Thomas Harding, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. My name is Lester Thomas Harding. I am 74 years old and legally competent to execute this Declaration.

2. I am the named plaintiff in the above-captioned case, and make this Declaration in support of Plaintiffs' Opposition to Diamond Resort Companies' Motion to Compel Plaintiffs to Arbitration and To Stay or Dismiss this Action.

3. My wife, Ilona Harding, and I entered into a series of Purchase and Security Agreements ("PSAs") with Diamond Resorts U.S. Collection Development, L.L.C ("Diamond").

4. At no time during any of the sales processes with Diamond did we have any power or authority to negotiate the terms and conditions of the PSAs that Diamond had us sign.

5. The PSAs were presented to us on pre-printed forms and on a take it or leave it basis.

6. I am not a lawyer nor do I have any formal legal training.

7. Prior to the filing of my lawsuit, I instructed my attorney, Robert C. Tarics, to send a demand letter to Diamond. Mr. Tarics mailed the signed demand letter to Diamond on October 11, 2016. I read the proposed demand letter from Mr. Tarics on or after October 1, 2016. As such, I first formed an intent, want or desire for the Arbitration Provision found in Section 18 of the Diamond PSA to **NOT** apply on or after October 1, 2016. I have continued to want the Arbitration Provision **NOT** to apply ever since that date.

8. In the October 11, 2016 demand letter to Diamond, I notified Diamond that I was exercising my rights to opt-out of any and all Arbitration Provisions or agreements contained in any of the PSAs that I had signed with Diamond.

2

9. When I exercised my opt-out rights from the Arbitration Provisions found in the Diamond PSAs, I expressly notified Diamond that I did not want the Arbitration Provision to apply to me. I also notified Diamond that I was opting out of the class action ban, the ban against aggregating claims, and the ban against private attorney general actions.

10. A true and correct copy of the October 11, 2016 demand letter to Diamond is attached hereto as Exhibit A and incorporated by reference for all purposes.

11. The demand letter expressed my intent to notify Diamond of my decision to opt-out of arbitration not only on my behalf, but also on behalf of all other putative class members. My notice of intent to opt-out of the Diamond Arbitration Provisions found in Section 18 of the PSAs, as well as any other arbitration agreements contained in any contract I may have signed with Diamond, was sent to Diamond less than 30 days from the date when I first wanted the Arbitration Provisions **NOT** to apply.

12. Based on the foregoing, I timely exercised my rights to opt out of the Diamond Arbitration Provisions, not only for myself, but also on behalf of all of other putative class members in my lawsuit against the Diamond Defendants.

13. It is my desire to have my case decided by a jury trial as guaranteed by the Seventh Amendment to the United States Constitution and any other applicable state or federal laws. I do not want to have any of my claims against any of the Defendants determined or decided through arbitration.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 17th day of April 2017, in _Phoenix_, Arizona.

LESTER THOMAS HARDING

3

**EXHIBIT "C"**

# THE

## PUBLIC OFFERING STATEMENT OF

# THE PROSPECTIVE

## DIAMOND RESORTS U.S. COLLECTION

**THE NEVADA LAW REGULATING TIME-SHARE SALES REQUIRES THAT:**

**FIRST:** A prospective purchaser or lessee **MUST BE GIVEN** this Public Offering Statement;

**SECOND:** The broker or sales agent **MUST REVIEW** the contents of this Public Offering Statement with you;

**THIRD:** If you purchase any time share, you must **SIGN A RECEIPT** indicating you have received this Public Offering Statement;

**AND RECOMMENDS:**

**FIRST:** You **DO NOT SIGN ANY CONTRACT OR AGREEMENT** before you have thoroughly read and understood it and this Public Offering Statement;

**SECOND:** You see the **EXACT PROJECT** you may be considering, or if the time-share plan is a multi-site plan, you understand the plan **BEFORE SIGNING** any agreement for a reservation, option, lease or purchase.

**NEVADA LAW STATES:**

"The purchaser of a time share may cancel, by written notice, the contract of sale until midnight of the 5th calendar day following the date of execution of the contract. The contract of sale must include a statement of this right.

The right of cancellation may not be waived. Any attempt by the developer to obtain a waiver results in a contract which is voidable by the purchaser."

1

# NEVADA

# PUBLIC OFFERING STATEMENT

### FOR

## DIAMOND RESORTS U.S. COLLECTION

### FILED BY

## DIAMOND RESORTS U.S. COLLECTION DEVELOPMENT, LLC
### 10600 West Charleston Boulevard, Las Vegas, Nevada 89135

July 15, 2004
Initial Permit Date

August 1, 2015
Effective Date

### PUBLIC OFFERING STATEMENT DISCLAIMER

THIS REPORT IS NOT A RECOMMENDATION OR AN ENDORSEMENT BY THE STATE OF NEVADA OF THE TIME-SHARE PLAN DESCRIBED HEREIN BUT IS PROVIDED FOR INFORMATIONAL PURPOSES ONLY.

**Purchaser must sign that he has received and reviewed this public offering statement with the Nevada licensed sales agent or project broker.**

The statements contained in this Public Offering Statement are only summary in nature. A prospective purchaser should review the purchase contract, all documents governing the time-share plan provided or available to the purchaser and the sales materials. You should not rely upon oral representations as being correct. Refer to this public offering statement, the purchase contract and the documents governing the time-share plan for correct representations.

State of Nevada
Real Estate Division
2501 E. Sahara Ave., Ste. 206
Las Vegas, NV 89104
(702) 486-3790
Nevada Permit No.:  TSP.0504308

2

terminate the component site project. For example, this might happen if a condominium owners association votes to terminate a condominium containing Collection Accommodations. The Developer has the right, without the consent of anyone else, to withdraw any or all inactive resort interests from the Collection. The Developer may use this right by giving written notice to the Association, the Trustee or to someone else who is holding title to the inactive resort interests. If this happens, the person holding title must transfer title to the inactive resort interests to the Developer.

**4.    DESCRIBE THE ACCOMMODATIONS OF THE TIME SHARE.**

Refer to Schedule I for a description of the Collection Accommodations.

**5.    PROVIDE A STATEMENT OF THE PROPERTY TAXES FOR THE TIME-SHARE PLAN.**

The aggregated property taxes for the Collection accommodations at all resorts make up approximately 2.4% of the annual Collection budget. Members pay their share of the taxes levied against the Association by the Component Sites Owners Associations through their annual Standard Assessments.

**6.    PROVIDE A SUMMARY OF THE RESTRICTIONS, EASEMENTS AND ZONING OF THE TIME SHARE THAT MAY LIMIT THE PURCHASER'S USE OR SALE.**

<u>Restrictions On Use</u>.

The Rules and Regulations for the Collection ("Regulations") contain restrictions on the use of the Collection Accommodations and facilities. A copy of the Regulations is available upon request.

Each Component Site is governed by rules and regulations that are similar to those of the Collection. The rules and regulations for a Component Site may include restrictions on pets. A summary of the material rules and regulations for the Component Sites is available from the Association upon request.

The use of Points to reserve Collection Accommodations for continuing commercial purposes or for any other purpose other than the personal use of the Member or the Member's family and guests is prohibited. The Developer is specifically exempted from this restriction, and is entitled to use reserved Collection Accommodations for promotional, rental, or other commercial purposes.

No Occupant shall damage, interfere with or do anything likely to lower the value or attractiveness or appearance of any Collection Accommodation, of any of the common areas or of any furnishings, fixtures or fittings therein. No Collection Accommodation or the common areas or the fixtures, fittings, furnishings or other equipment of any Collection Accommodation or any other common areas nor any part of, or area adjacent to, any Collection Accommodation shall be altered or damaged. No Occupant shall keep any animal, bird, fish or other livestock in or upon any Collection Accommodation, except such animals that assist persons with disabilities, e.g., seeing eye dogs.

9

No Occupant shall use any Collection Accommodation or permit the same to be used for any purpose whatsoever other than as a temporary private vacation home occupied by no more than the published maximum number of persons. The Occupants of Collection Accommodations shall not make use thereof for any purpose from which a nuisance can arise to other occupiers of adjoining space or for any illegal or immoral purpose whatsoever or for the purpose of any trade, business, profession or manufacture.

The following additional rules shall apply:

(a)    The windows of any Collection Accommodation shall not be darkened or obstructed other than by the use of the curtain material or internal blinds provided.

(b)    Clothes or other articles shall not be hung or exposed anywhere outside any Collection Accommodation or in any position visible from outside the building in which the Collection Accommodation is located.

(c)    No Occupant shall throw dirt, garbage, rags or any other deleterious material from the windows or balconies of any Collection Accommodation, or deposit such items into sinks, bathtubs, toilets and other pipes or conduits of any Accommodation.

(d)    No Occupant shall allow any music or singing whether by instrument or voices, radio, television or other means in any Collection Accommodation so as to cause nuisance or annoyance to any other occupier of adjoining space and in particular so as not to be audible outside the Collection Accommodation between 11:00 p.m. and 9:00 a.m.

(e)    No Occupant shall obstruct the private roadway, passageways or pedestrian walkways serving the Collection Accommodation nor use them for any other purpose than for access to or egress from the Collection Accommodation which the Occupant is entitled to use.

(f)    No Occupant shall store in any Collection Accommodation or near thereto any flammable or explosive material.

These rules provide only a summary of the rules and regulations for the Collection Accommodation. Such rules are subject to change without notice.

**No Warranties:** Seller makes no warranties, express or implied, of any type whatsoever regarding the collection or the collection accommodations, including but not limited to warranties of habitability, merchantability, or fitness for a particular purpose. The developer expressly disclaims, and purchaser irrevocably waives, each of the foregoing warranties.

**Waiver of Jury Trial:** Except as otherwise provided by applicable law, the purchaser shall be deemed to have waived any right they may have under any applicable law to a trial by jury in connection with any suit or legal proceeding that may be commenced concerning the interpretation, construction, validity, enforcement, or performance of the Purchase Agreement or any of the collection instruments.

If purchaser does not want this arbitration provision to apply, within 30 days purchaser must send a signed letter to seller stating that the arbitration provision does not apply. Opting out of arbitration will not affect any other provision of this agreement.

**Class Action Ban:** No bound party may participate in a class action in court or in class-wide arbitration, either as a representative, class member or otherwise, with respect to any claim. No bound party may participate in a private attorney general proceeding in court or

10

in arbitration, with respect to any claim. No claims involving the bound parties may be joined or consolidated with claims by or against any other person.

**Notice:** Any holder of the consumer credit contract is subject to all claims and defenses which the debtor could assert against the seller of goods or services obtained pursuant thereto or with the proceeds thereof. Recovery thereunder by the debtor shall not exceed amounts paid by the debtor.

<u>Restrictions on Sale.</u>

## THE SALE, LEASE, TRANSFER OR CONVEYANCE OF A TIME SHARE IS RESTRICTED OR CONTROLLED

The transfer of Memberships is governed by Article 9 of the Declaration. No purported transfer of a Membership will be effective unless and until: (a) all Assessments, Personal Charges or other amounts due to the Collection have been paid in full, including payment of a transfer fee of two hundred fifty dollars ($250.00); (b) the Association has consented to the transfer; (c) any lender holding a security interest in the Membership has consented, in writing, to the transfer of the Membership, provided the lender has given the Association notice of such security interest; (d) a copy of the instrument transferring the Membership is provided to the Association for the Collection records and the original Points Certificate of the transferor has been surrendered to the Collection, endorsed by the transferor; (e) a replacement Points Certificate has been issued by the Collection to the transferee; and (f) the transferee's name has been entered in the Register of Members.

A Member may reserve a Collection Accommodation and thereafter may rent, sublease or license the Member's assigned Collection Accommodation. A Member may not reserve, occupy or rent out a Collection Accommodation if the Member has not paid the Association all amounts due from the Member under the Collection Instruments. A Member may not use the Collection Accommodations for any commercial purposes, including but not limited to commercial renting activities; the public advertising in print or online to seek renters is deemed a prohibited commercial use.

<u>Easements</u>.

The Collection Accommodations will be subject to the customary utility easements for water, sewer, electric, cable TV and telephone service lines. In addition, the Collection Accommodations will be subject to certain easements created by the Component Site project documents and/or the Declaration, generally including the following (although such may vary somewhat between Component Sites):

(a)     Easements to facilitate sales. The Developer and its Appointees may, at its option and with the consent of the Reservation Services Provider, use a Use Period or any Collection Accommodation that remains unreserved as of fifty-nine (59) days prior to that Use Period for promotional or other purposes.

(b)     Easement for ingress and egress. Each duly authorized occupant of a Collection Accommodation has a right of access to and over the Component Site common property, subject to rules, regulations and restrictions established by the Component Site owners association.

11

(c)     Easement for access to Collection Accommodations. Authorized representatives of the Component Site owners association and of the Association, including us and the managing agent, may enter any Collection Accommodation to the extent necessary to correct conditions threatening other units, to make repairs to the common elements that are accessible only from the unit, or to correct conditions which constitute violations of the Collection Instruments or the Component Site project documents. Notice must be given to the record owner or occupant prior to entry, except in emergencies when a unit may be entered without notice. In the event of violation of the foregoing documents, the violation may be corrected without the consent of the record owner or occupant, and the responsible person may be charged with the resulting expenses.

**Zoning**:

Timeshare use is permitted in each of the Component Site locations. The Collection Accommodations may be used by the Developer or its Appointees as models and for any other permitted commercial purpose during the sales period. Except for such use, all Collection Accommodations in the time-share program will be used solely for, and are restricted to, residential purposes. Such uses of the Collection Accommodations are consistent with any applicable zoning ordinance classification for the Component Sites.

7.     **DESCRIBE THE RESERVATION SYSTEM.**

Access for Members to a Reservation System is provided for in the Collection Instruments and is an integral part of the Collection operations. The costs of obtaining such access and reservation services are included in the Association's Collection Costs.

The Association has engaged Diamond Resorts International Club, Inc., a Florida corporation and an affiliate of the Developer ("DRIC"), to serve as the Reservation Services Provider for the Collection. DRIC will provide and operate the reservation system by which Members arrange for their use of the Collection Accommodations. The Association has entered into a Reservation Services Provider Agreement with DRIC to serve as the initial Reservation Services Provider.

The Regulations outline the required procedures concerning the making and cancelling of reservations and the use of Collection Accommodations. The following is a summary of Section 2.2 of the Regulations with respect to the Reservation System:

(1)     Reservations must be made in writing or by telephone to DRIC or as otherwise permitted in accordance with the Regulations. Reservations are generally honored on a "first-come, first-served" space-available basis and may be made no earlier than thirteen (13) months prior to the first day of the intended Use Period, except that a standing reservation will be made automatically each year for the use of Specific Use Points. Members who purchase Points to which the Developer has designated priority reservation rights may request reservations during the designated advance period before other Members may request reservations for the designated Collection Accommodations that are subject to such priority reservation rights.

(2)     A Member's proposed reservation must be confirmed in writing or by facsimile transmission before it is valid. Until so confirmed, there is no guarantee that any particular reservation request will be fulfilled

(3)     The automatic annual standing reservation for the use of Specific Use Points will be for the specified Use Period in the specified type of Collection Accommodation at the

12

**EXHIBIT "D"**



# STATE OF MINNESOTA

### OFFICE OF THE ATTORNEY GENERAL

LORI SWANSON
ATTORNEY GENERAL

102 STATE CAPITOL
ST. PAUL, MN 55155
TELEPHONE: (651) 296-6196

**For Immediate Release**
July 19, 2009

**Contact:** Ben Wogsland at: (651) 296-2069
(612) 818-0965 (pager)

## NATIONAL ARBITRATION FORUM
## BARRED FROM CREDIT CARD AND CONSUMER ARBITRATIONS
## UNDER AGREEMENT WITH ATTORNEY GENERAL SWANSON
*Swanson Also Wants Congress to Ban "Fine Print" Forced Arbitration Clauses*

Minnesota Attorney General Lori Swanson and the National Arbitration Forum—the country's largest administrator of credit card and consumer collections arbitrations—have reached an agreement that the company would get out of the business of arbitrating credit card and other consumer collection disputes.

"I am very pleased with the settlement. To consumers, the company said it was impartial, but behind the scenes, it worked alongside credit card companies to get them to put unfair arbitration clauses in the fine print of their contracts and to appoint the Forum as the arbitrator. Now the company is out of this business," said Swanson.

Swanson sued the National Arbitration Forum on Tuesday, alleging that the company-- which is named as the arbitrator of consumer disputes in tens of millions of credit card agreements--hid from the public its extensive ties to the collection industry. The lawsuit alleged that the Forum told consumers and the public that it is independent and neutral, operates like an impartial court system, and is not affiliated with and does not take sides between the parties. The lawsuit alleged that the Forum worked behind the scenes, however, to convince credit card companies and other creditors to insert arbitration provisions in their customer agreements and then appoint the Forum to decide the disputes. The suit also alleged that the Forum has financial ties to the collection industry. The suit alleged that the company arbitrated 214,000 consumer arbitration claims in 2006, nearly 60 percent of which were filed by laws firms with which the Forum is linked through ties to a New York hedge fund.

Under the settlement, the National Arbitration Forum will, by the end of the week, stop accepting any new consumer arbitrations or in any manner participate in the processing or administering of new consumer arbitrations. The company will permanently stop administering arbitrations involving consumer debt, including credit cards, consumer loans, telecommunications, utilities, health care, and consumer leases.

Credit card companies, banks, retail lenders, and cell phone companies increasingly place—in the fine print of their consumer agreements—what are known as "mandatory predispute arbitration clauses." Through these clauses, the consumers waive, in advance, their

right to have their day in court if a dispute arises. Instead, the consumer agrees—usually without knowing it—that any dispute will be resolved by an arbitrator selected by the credit card company or other creditor. Credit card companies are among the most prolific users of mandatory arbitration clauses. Just by keeping a credit card, the consumer agrees to the terms and conditions of the card, even if the arbitration provision was sent to the consumer after the card was issued. As a result of mandatory arbitration clauses, which appear in tens of millions of consumer agreements, hundreds of thousands of consumer disputes are resolved each year not by a judge or jury, but by a private arbitration system.

Swanson said that late this week she accepted an invitation from Congressman Dennis Kucinich, Chairman of the Congressional Committee on Oversight and Government Reform, to testify before the Committee this coming Wednesday in Washington, D.C. She said she will ask Congress to prohibit the use of mandatory pre-dispute arbitration clauses in consumer contracts.

"The playing field is tilted against the ordinary consumer when credit card companies bury unfair terms like forced arbitration clauses in fine print contacts. Congress should change that," said Swanson.

Swanson also announced that she sent a letter to the American Arbitration Association asking it to play a leadership role by ceasing to accept arbitration filings on consumer credit and collection matters arising out of mandatory pre-dispute arbitration clauses.

Swanson noted that the City of San Francisco is in litigation with the Forum and that other state Attorneys General have contacted her about these issues since the announcement of the lawsuit. "I am very pleased with the results of our lawsuit. It is good for consumers that this company will no longer be able to administer credit card and consumer debt collection arbitrations. I hope other jurisdictions will use whatever authority they have to look at other possible remedial relief in this area," said Swanson.

The settlement allows the Company to continue to arbitrate internet domain name disputes (which the company handles under an appointment from the Internet Corporation for Assigned Names and Numbers (ICANN)), personal injury protection claims (which the company performs under appointment and supervision under the New Jersey state government), and cargo disputes (which the company performs under rules established by the U.S. Department of Transportation). These areas were not part of the lawsuit, and the company performs the work under the supervision of government or non-government organizations (NGOs). Accordingly, the settlement does not affect this very limited activity.

The Consent Decree and amendatory letter are attached.

--30--

STATE OF MINNESOTA

COUNTY OF HENNEPIN

DISTRICT COURT

FOURTH JUDICIAL DISTRICT

Case Type:  Other Civil
(Consumer Protection)

State of Minnesota by its Attorney General,
Lori Swanson,

                Plaintiff,

    vs.

National Arbitration Forum, Inc.,
National Arbitration Forum, LLC, and
Dispute Management Services, LLC, d/b/a
Forthright,

                Defendants.

Court File No. 27-CV-09-18550
Judge John L. Holahan

**CONSENT JUDGMENT**

WHEREAS, Plaintiff State of Minnesota, by and through its Attorney General, Lori Swanson ("State"), filed a Complaint in this matter on July 14, 2009 ("Complaint") against National Arbitration Forum, Inc., National Arbitration Forum, LLC, and Dispute Management Services, LLC, d/b/a Forthright (hereinafter, collectively, the "NAF Entities") (the State, and the NAF entities are hereinafter collectively referred to as the "Parties");

WHEREAS, this Consent Judgment shall not be construed as an admission of wrongdoing or liability by the NAF Entities;

NOW, THEREFORE, in the interest of resolving this action, the State and the NAF Entities hereby stipulate and consent to entry of this Consent Judgment, as set forth below:

1.    The purpose of this Consent Judgment is to require the complete divestiture by the NAF Entities of any business related to the arbitration of consumer disputes.

2.    The term "Consumer Arbitration" means any arbitration involving a dispute between a business entity and a private individual which relates to goods, services, or property of any kind allegedly provided by any business entity to the individual, or payment for such goods, services, or property.  The term includes any claim by a third party debt buyer against a private individual.  It does not include, however, the arbitration of internet domain name disputes on behalf of the Internet Corporation for Assigned Names and Numbers (ICANN), the processing of personal injury protection (PIP) disputes, the processing of shipping or storage disputes under 49 CFR § 375.211, or arbitrations where a NAF Entity is appointed and supervised by a government entity.

3.    On or after July 24, 2009, no NAF Entity shall:

    a.    Accept any fee for processing any new Consumer Arbitration.

    b.    Administer or process any new Consumer Arbitration.

    c.    In any manner participate in any new Consumer Arbitration.

    d.    Attempt to influence the outcome of any arbitration proceeding currently pending before it.

4.    The NAF Entities shall not engage in any deceptive practices, or make any false or misleading statements, in violation of Minn. Stat. §§ 325F.69, subd. 1; 325D.44, subd. 1; and 325F.67.

5.    The NAF Entities shall pay investigative costs to the State of Minnesota within ten days of the date this Consent Judgment is signed.  Notwithstanding this payment, the NAF Entities shall also pay the State of Minnesota an amount equal to any amount paid to the City of San Francisco over the next six months, in excess of the City's actual investigative expenses and attorneys' fees.

2

6.     The Parties have read this Consent Judgment and voluntarily agree to its entry.

7.     In consideration of the stipulated relief, the sufficiency of which is acknowledged, the Office of the Attorney General, by execution of this Consent Judgment, hereby fully and completely releases the NAF Entities, including all of their past and present agents, employees, officers, directors, subsidiaries, shareholders, and affiliates, of any and all claims of the Attorney General connected with or arising out of the allegations in the State's Complaint in the above-captioned action, up to and including the date of this Consent Judgment.

8.     Promptly after receiving notice that the Court executes this Consent Judgment, the State shall voluntarily dismiss the above-captioned action pursuant to Minnesota Rule of Civil Procedure 41.01(a).

9.     The Parties shall cooperate to implement and facilitate this Consent Judgment, including the exchange of information reasonably necessary for that purpose or to confirm the NAF Entities' compliance with this Consent Judgment.

10.    Any failure by any Party to this Consent Judgment to insist on performance by any other Party of any provision of this Consent Judgment shall not be deemed a waiver of any of the provisions included herein.

11.    The Parties agree to bear their own costs and fees in this matter.

12.    Each Party participated in the drafting of this Consent Judgment, and each agrees that the Consent Judgment's terms may not be construed against or in favor of any Party by virtue of draftsmanship. Each signatory further agrees they have authority to enter into this Consent Judgment.

3

13.    This Consent Judgment, including any issues relating to interpretation or enforcement, shall be governed by the laws of Minnesota. The Court shall retain jurisdiction over this matter to enforce the terms of this Consent Judgment.

Dated: 7/17/09

National Arbitration Forum, Inc.

By: _____
    Its _____

Dated: 7/17/09

National Arbitration Forum, LLC

By: _____
    Its _____

Dated: 7/17/09

Dispute Management Services, LLC, d/b/a Forthright

By: _____
    Its    CEO

Dated: 7/17/09

LORI SWANSON
ATTORNEY GENERAL
STATE OF MINNESOTA

_____
Lori Swanson

IT IS SO ORDERED.

Dated: _____

BY THE COURT:

_____
John L. Holahan
Hennepin County District Court Judge

LET JUDGMENT BE ENTERED ACCORDINGLY.

4



OFFICE OF THE ATTORNEY GENERAL

### State of Minnesota

ST. PAUL, MN 55155

LORI SWANSON
ATTORNEY GENERAL

July 19, 2009

President
American Arbitration Association
Corporate Headquarters
1633 Broadway
10th Floor
New York, New York 10019

Dear President:

This office recently concluded a year long investigation of National Arbitration Forum ("NAF"). The investigation concluded with an agreement by NAF that it would no longer arbitrate consumer debt disputes. I enclose a copy of the Consent Order and the amendatory letter. While the lawsuit focused on conflict of interest issues, our investigators and attorneys also interviewed over one hundred consumers who complained about the arbitration process. Based on our investigation, it is my conclusion that pre-dispute mandatory arbitration provisions are fundamentally unfair to the consumer. This is particularly the case with credit card contracts and other consumer contracts—such as cell phone, utility, loan, and hospital agreements—where the mandatory arbitration provisions are hidden in the fine print. Our findings include the following:

First, pre-dispute mandatory arbitration agreements are nearly always the product of unequal bargaining power between the consumer and the business. In almost every interview we found that the consumer was not aware of the arbitration provision. In many cases the consumer never saw the provision, because it was simply mailed with a monthly statement. The consumer is given virtually no opportunity to reject the provision. Yet, through these provisions, the consumer gives up their important right to have his or her day in court.

Second, because the consumer is unaware of the mandatory arbitration provision, in many cases the consumer ignored the notice of arbitration served on them. Since they did not know that they agreed to arbitration, and were unfamiliar with the arbitration process, they didn't believe they were obligated to respond to an arbitration notice from an office in Minnesota. It is part of our democracy that we have a right to redress in a court of law, and that includes the notion that the court should be easily accessible to the consumer. Through pre-dispute mandatory arbitration clauses, consumers forfeit this important right without even knowing it.

American Arbitration Association
July 19, 2009
Page 2

Third, it is apparent, based on many interviews with consumers, arbitrators and employees of NAF, that arbitrators have a powerful incentive to favor the dominant party in an arbitration; namely, the corporation. Indeed, there is a term commonly used in the arbitration industry called "repeat player bias," describing a phenomena describing where an arbitrator is more likely to favor the party that is likely to send future cases. This bias does not exist in a court, where the judge is not reliant on a dominant player for his or her future income. In the case of NAF, arbitrators and employees claimed that arbitrators who issued an award against the corporation, or who failed to award attorney's fees against the consumer, were simply "deselected" and not appointed to future proceedings.

Fourth, consumers are not aware they can submit exhibits, and many are not aware that there will only be a "document hearing" with no opportunity to be heard. For instance, victims of identity theft were not told to submit a copy of a police report, even though arbitrators were advised that, absent such documentation, the claim of identity theft should be ignored.

Fifth, the arbitration process is fundamentally unfair for holding corporations responsible for any wrongdoing. In some cases, consumers forfeited important rights in the fine print of contracts they had never seen. Consumers who we interviewed in the NAF investigation were told that, when they initiated a claim against the corporation, the claim could be delayed for up to one year before there was any review of the matter.

There are many other defects in the process. The fundamental problem with consumer arbitrations under "fine print" contracts is that the arbitration company draws its income from the dominant participant--namely the credit card company, telecommunications company, the hospital, etc.--and personnel have a financial incentive to make sure that the corporation is pleased with the outcome. Otherwise, the corporation will undoubtedly look to other arbitration administrators. As noted above, this "repeat player" bias does not occur in court, since judges rely on taxpayers—not litigants—for their income.

In short, for the above reasons and many others, I ask that your organization take the initiative to announce that it will not accept the arbitration of credit card and other consumer debt claims based on pre-dispute mandatory arbitration clauses. Because the AAA and NAF are the largest arbitration companies, I believe such a proclamation by AAA would be a powerful signal to Congress that reform is desperately needed in this area.

Sincerely

LORI SWANSON
Attorney General

Enclosure